**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

THE UNITED STATES OF AMERICA,

       Plaintiff,

v.                                           Civ. No. 12-cv-0120 MCA/SMV

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF OTERO and
STATE OF NEW MEXICO,

       Defendants.

**THE UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION FOR**

**SUMMARY JUDGMENT AND IN OPPOSITION TO OTERO COUNTY'S MOTION**

**FOR SUMMARY JUDGMENT [ECF NO. 63]**

## TABLE OF CONTENTS

**INTRODUCTION** ………………………………………………………….. 1

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ……………………….. 3

**RESPONSE TO OTERO COUNTY'S STATEMENT OF FACTS** ………………. 6

**STANDARD OF REVIEW** …………………………………………..…………. 7

**ARGUMENT** …………………………………………….…………………... 8

I.      **THE UNITED STATES HAS STANDING TO CHALLENGE THE NEW MEXICO STATUTE AND OTERO COUNTY RESOLUTION** ………. 8

II.     **THE STATE OF NEW MEXICO AND OTERO COUNTY HAVE NO AUTHORITY TO DIVEST THE UNITED STATES OF ITS JURISDICTION AND POWER OVER FEDERAL PUBLIC LANDS** ………. 16

III.    **THE NEW MEXICO STATUTE AND OTERO COUNTY RESOLUTION VIOLATE FEDERAL LAW GOVERNING THE USE OF NATIONAL FOREST SYSTEM LANDS** ………………………….. 20

IV.    **THE NEW MEXICO STATUTE AND OTERO COUNTY RESOLUTION INTERFERE WITH IMPLEMENTATION OF THE COMPREHENSIVE CONGRESSIONAL REGIME FOR MANAGING THE NATIONAL FORESTS** ………………………….….. 28

       A.    **Congress Has Delegated The Authority To Manage The National Forest System To The Forest Service And Has Established A Comprehensive Legal Regime Governing The Use Of The United States' Property** ……………………….………………………….... 29

       B.    **The Forest Service Has Promulgated Detailed Regulations To Implement The Comprehensive Federal Statutory Scheme Governing Management Of The National Forest System** …………….... 32

       C.    **State And Local Governments May Propose Projects And Participate In The Forest Service Planning Processes, But The Forest Service Is Vested With Final Authority To Manage National Forest System Lands** ……………………………….…..…. 34

       D.    **The New Mexico Statute And Otero County Resolution Are Preempted By Congress' Comprehensive Legal Regime For The Management Of National Forest System Lands** ……………………………….………..…… 35

i

1.      Occupancy Of The Field Of National Forest Land
        And Resource Planning And Management …………….….…...  35

2.      The New Mexico Statute And Otero County Resolution
        Are Obstacles To The Congressional Regime For
        Management Of National Forest System Lands …………..…...  36

V.      THE TENTH AMENDMENT DOES NOT ALLOW THE STATE
        OR OTERO COUNTY TO TRESPASS AND TAKE THE
        UNITED STATES' PROPERTY …………………………………..…...  39

**CONCLUSION** …………………………………………………………...…...  46

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56, the United States is entitled to summary judgment as a matter of law.  The United States' Complaint for Declaratory and Injunctive Relief ("Complaint"), ECF No. 1, raises two counts, one against the State of New Mexico and one against the Board of County Commissioners of the County of Otero ("Otero County").  Count I seeks a declaration that NMSA § 4-36-11 (2001) ("New Mexico Statute," ECF No. 1-1) is preempted by Federal law and is unconstitutional, invalid, null, and void.  ECF No. 1 ¶¶ 49-55 (Count I).  Count II seeks a declaration that Otero County Resolution #05-23-11/99-50 ("Resolution," ECF No. 1-2) is also preempted by Federal law and is unconstitutional, invalid, null, and void.  ECF No. 1 ¶¶ 56-61 (Count II).  Summary judgment in favor of the United States is appropriate because there is no dispute of material fact and the United States is entitled to judgment as a matter of law.  The United States therefore respectfully requests that the Court grant the United States' motion for summary judgment, ECF No. 70, in its favor on Counts I and II, and deny Otero County's motion for summary judgment, ECF No. 63.

Defendants New Mexico and Otero County improperly assert control over the use of property and lands owned by the United States.  Otero County has repeatedly indicated, most recently in the March 27, 2014 Declaration of County Commissioner Ronnie Rardin, ECF No. 64-1 ("Rardin Decl."), that it intends to "take physical action" to implement its "Garrett Plan" to cut and remove trees and undergrowth on up to 69,000 acres of Forest Service lands "with or without the consent of the Forest Service."  *Id.* ¶ 6.  The Forest Service cannot lawfully approve the "Garrett Plan," which is inconsistent with Federal laws protecting National Forest System lands and resources, including endangered species.  *See* Declaration of Robert G. Trujillo, PhD, Deputy Director for Ecosystem Analysis, U.S. Forest Service ("Trujillo Decl."; attached hereto)

¶¶ 7-8, 13, 18, 28-45.  Thus, Otero County will proceed without the authorization of the Forest Service, in violation of the Property Clause and Supremacy Clause of the United States Constitution.  Judicial intervention is therefore necessary to prevent imminent and irreparable harm to the United States' property, resources, and sovereign interests.

The New Mexico Statute purports to usurp the United States' jurisdiction over National Forest System lands to delegate authority to counties that declare a disaster "to clear and thin undergrowth and to remove or log fire-damaged trees" on National Forest System lands.  NMSA § 4-36-11(A)-(C).  Invoking the New Mexico Statute, Otero County adopted its Resolution on May 23, 2011, developed the Garrett Plan to log trees on more than 69,000 acres of the Lincoln National Forest, and began implementing the Garrett Plan on September 17, 2011.  Absent the filing of this lawsuit, Otero County would have continued logging National Forest System lands without Forest Service permission, causing grave irreparable injury to the United States' property and violating numerous Federal laws.

Because neither Congress nor the Forest Service has authorized New Mexico and Otero County to enter National Forest System lands to cut and remove trees and undergrowth pursuant to the Garrett Plan, the New Mexico Statute and Otero County Resolution violate both the Property Clause and the Supremacy Clause.  The New Mexico Statute and the Otero County Resolution are facially unconstitutional and contrary to the well-settled body of Federal law governing federal lands and property.  *See, e.g., Utah Power & Light Co. v. United States*, 243 U.S. 389, 403-04 (1917) (holding that "the power of Congress [over lands of the United States] is exclusive," and that States have *no* authority to "invest others with any right whatever" in those lands).  As such, New Mexico's and Otero County's attempts to take control of federal

property in patent violation of the United States Constitution cannot stand and must be declared invalid, null, and void.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.      The lands comprising the Lincoln National Forest are owned by the United States. *See* Declaration of Sandra Raun, Land Status Program Specialist, U.S. Forest Service (attached hereto) ¶ 7.  Most of the National Forest System lands in Otero County surrounding Cloudcroft, New Mexico, that are the subject of this lawsuit were designated the Sacramento National Forest by Presidential Proclamation signed by Theodore Roosevelt on April 24, 1907.  *Id.* ¶ 6.  The Sacramento National Forest eventually became part of the Lincoln National Forest.  *Id.*; ECF No. 1 ¶ 26; ECF No. 9 ¶ 26; ECF No. 17 ¶ 26.

2.      In 2001, the State of New Mexico enacted NMSA § 4-36-11, ECF No. 1-1, which "declared" that the United States Forest Service's alleged failure[1] to eliminate and reduce the threat of catastrophic forest fires "constitutes grounds for the forfeiture of jurisdictional supremacy" by the United States over National Forest System lands.  ECF No. 1-1, NMSA § 4-36-11(A)(3).  The New Mexico Statute declares that the "forfeiture of jurisdictional supremacy" "requires" the State to "authorize any action it presently deems necessary to fill the vacuum created by the federal government by assuming jurisdiction to reduce to acceptable levels, if not remove, the threat of catastrophic fires posed by present conditions in national forests within [the State's] borders."  *Id.* § 4-36-11(A)(4).

3.      Declaring that the State would exercise its "police power" "within those areas of the national forests of New Mexico that suffered severe fire damage, as determined by the local board of county commissioners," *id.* § 4-36-11(B), the New Mexico Statute purports to delegate

---

[1] The Forest Service has, in fact, managed the National Forests in New Mexico to mitigate and reduce the threat of forest fires.  Trujillo Decl. ¶¶ 2-3, 5.

to the counties authority to "take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster" on National Forest System lands.  *Id.* § 4-36-11(C).

4.      On May 23, 2011, acting under the ostensible grant of authority under the New Mexico Statute, Otero County adopted Resolution #05-23-11/99-50.  ECF No. 1-2.  Otero County's Resolution "declares a state of emergency and disaster to exist in and around the communities and watersheds in the Sacramento Mountains" (i.e., the Lincoln National Forest). *Id.* at 2.  The Resolution further states that the County "formally notifies State and Federal Officials that pursuant to NMSA § 4-36-11 C[,] it is empowered to, . . . as a county in which a disaster has been declared" pursuant to the New Mexico Statute "take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster." *Id.*

5.      In August 2011, pursuant to its Resolution, the County completed a plan ("the Garrett Plan") to cut and remove trees and other forest materials from 69,000 acres of National Forest System lands on the Sacramento Ranger District of the Lincoln National Forest.  Trujillo Decl. ¶¶ 15, 18; ECF No. 1 ¶¶ 41-42; ECF No. 17 ¶¶ 41-42.[2]

6.      On September 17, 2011, Otero County held a ceremonial "emergency tree cutting" event to mark the beginning of the County's implementation of the Garrett Plan. Trujillo Decl. ¶¶ 17, 20; ECF No. 1 ¶¶ 46-47; ECF No. 17 ¶¶ 46-47.  The "kick off" event, on approximately one-quarter acre, was done under the authority of a Forest Service contract for

---

[2] In its Answer, ECF No. 9, the State indicated that it "has insufficient information to admit or deny the allegations" about the actions of Otero County.  *See, e.g.*, *id.* ¶¶ 41-48.  Thus, to date, the State has not established a dispute about the accuracy of these factual statements.

which the Forest Service had already completed its compliance obligations under Federal law. Trujillo Decl. ¶¶ 20-22, 27.

7.     The Forest Service felt coerced into approving the "kick off" event project by Otero County's threat of proceeding with the event without authorization.  Trujillo Decl. ¶ 20 ("Otero County's threats of implementing the Garrett Plan without Forest Service authorization compelled us to authorize this 'kick off' event, despite our reservations with it, in order to avoid putting our employees at risk from the County's actions and from confrontations with the County Sheriff.").     During the "kick off" event (also called the "Tree Party" event), County representatives and others gave speeches, many of which were filled with anti-Federal government rhetoric, inciting the large crowd and making the use of National Forest System lands all the more dangerous for the Federal employees charged with managing those lands.  *See (last visited 06/04/14):*

https://www.youtube.com/watch?v=ulMPIaP0jWk;

https://www.youtube.com/watch?v=CFksDpDXDBQ;

https://www.youtube.com/watch?v=HdgFrPvfx1w;

https://www.youtube.com/watch?v=ifV6dUICbaA;

https://www.youtube.com/watch?v=zuYsDerPNUQ.

8.     The Forest Service has advised Otero County that the Garrett Plan as a whole is inconsistent with Federal law and the Forest Plan for the Lincoln National Forest, and cannot be approved.  Trujillo Decl. ¶¶ 7-8, 13, 18, 28-44; *see id.* ¶ 45 ("For the reasons identified above, the specific Garrett Plan and Otero County Project has not and cannot be approved or allowed by the Forest Service under Federal law.").  Otero County has repeatedly informed the public and Forest Service that the County would continue implementing the Garrett Plan (or "Otero County

Project") to log trees on 69,000 acres of National Forest System lands *without Forest Service permission*. Trujillo Decl. ¶¶ 20, 49-50, 55-56; ECF No. 1 ¶ 47; ECF No. 17 ¶ 47.

9.     Otero County has also repeatedly advised the public and the Forest Service that Otero County's implementation of the Garrett Plan is not subject to Federal law, Trujillo Decl. ¶¶ 7-9, 13, 25, 36, 50, 51, and that the County Sheriff will arrest any Forest Service employees or officers that interfere with the County's implementation of the Garrett Plan. Trujillo Decl. ¶¶ 10, 53-54. The only reason Otero County has held off implementing the Garret Plan has been the pendency of this lawsuit. Trujillo Decl. ¶ 55.

## RESPONSE TO OTERO COUNTY'S STATEMENT OF FACTS

Pursuant to D.N.M.LR-Civ. 56.1(b), Otero County was required to "set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists," and these facts "must be numbered and must refer with particularity to those portions of the record upon which the movant relies." Otero County did not comply with this Local Rule, but asserts that "there are only two factual issues desiring of further factual development." ECF No. 64 at 3. The first, according to Otero County, is "ownership of federal lands" on which Otero County intends to act. *Id.* Otero County states that it "does not hold title to the lands at issue," and does not dispute that the United States does hold title. *Id.* at 3-4. The second is that Otero County intends to move forward in implementing the Garrett Plan by cutting and removing trees on National Forest System lands, regardless of whether it has the consent of the Forest Service. *Id.* at 4. The United States does not dispute that, if this lawsuit is dismissed, Otero County intends to immediately cut and remove trees and other vegetation from National Forest System lands without authorization from the Forest Service.

6

## STANDARD OF REVIEW

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).   "The party seeking summary judgment bears the initial burden of indicating the portions of the record that 'demonstrate the absence of a genuine issue of material fact.'"  *Duke v. Garcia*, No. 11-CV-784-BRB/RHS, 2014 WL 1318646, at *1 (D.N.M. Feb. 28, 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).   "If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant."  *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (quoting Fed. R. Civ. P. 56(e) (2007)).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," and "only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment."  *Sanchez v. BNSF Ry. Co.*, 976 F. Supp. 2d 1265 (D.N.M. 2013) (citing *Anderson v. Liberty Lobb*y, Inc., 477 U.S. 242, 247-48 (1986)).

"When both parties move for summary judgment, the court must analyze each motion individually and on its own merits," and "'the denial of one does not require the grant of another.'"  *G.M. ex rel. B.M. v. Casalduc*, No. 1:13-cv-00049-JAP/KBM, 2013 WL 6038032, at *3 (D.N.M. Nov. 4, 2013) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).   "Cross-motions for summary judgments, however, do authorize a court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties."  *Brubach v. City of Albuquerque*, 893 F. Supp. 2d 1216, 1223 (D.N.M. 2012) (citations omitted).   "Where the facts are not in dispute and the parties only disagree about whether the

actions were constitutional, summary disposition is appropriate." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c)).

## ARGUMENT

## I.   THE UNITED STATES HAS STANDING TO CHALLENGE THE NEW MEXICO STATUTE AND OTERO COUNTY RESOLUTION

The United States has standing to challenge both the New Mexico Statute and the Otero County Resolution because it meets the test for standing articulated by the Supreme Court and applied in the Tenth Circuit.  In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court articulated a three-part test for the "irreducible constitutional minimum" for standing under Article III of the U.S. Constitution:  1) "injury in fact;" 2) "causation;" and 3) "redressability."  *Id.* at 560-61.  The United States, as Plaintiff here, "bears the burden of establishing these elements."  *Id.* at 561.  The first requirement of Article III standing -- which was the focus of this Court's order denying the United States' motion for judgment on the pleadings -- is that "the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).  Contrary to the Court's concern in denying the United States' motion for judgment on the pleadings, the United States has suffered a cognizable "injury in fact."

In *Lujan*, the Supreme Court emphasized that:

When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Lujan*, 504 U.S. at 561-62.  Under this proviso, there can be no question that the United States

has standing to challenge the legality of the State's and County's actions, as the United States is

not only "an" object of these government actions, but is the *sole* object of these actions.  The

New Mexico Statute purports to divest the United States of "jurisdictional supremacy" over the

United States' lands for which the Otero County Resolution has declared a disaster and purports

to give Otero County authority through its Resolution to enter the United States' lands to cut and

remove the United States' property without the United States' consent.  ECF No. 1-1, NMSA §

4-36-11(A)-(C). [3]  If the State had passed a statute targeting a single individual and authorizing

the County to destroy and take that individual's property, and the County acted on that statute,

there is no question that that individual would be the proper party to bring a lawsuit challenging

the State's and County's actions.  Likewise, the United States--as the sole object of the New

Mexico Statute and Otero County Resolution -- is the proper party here.  *See, e.g.*, *S. Utah*

*Wilderness Alliance v. Palma*, 707 F.3d 1143, 1157 (10th Cir. 2013) ("When determining

standing, a court asks whether these persons are the proper *parties* to bring the suit, thus focusing

on the qualitative sufficiency of the injury and whether the complainant has personally suffered

the harm.") (emphasis in original; citation omitted).  Even more to the point, "[t]he United States

is the proper party to prosecute an action to protect its sovereign rights.  It is the real party in

interest."  *United States v. Bureau of Revenue of State of N.M.*, 291 F.2d 677, 678-79 (10th Cir.

1961) (footnote omitted).

---

[3] It is well settled that trees on federal public lands are the property of the United States, and cutting and removing those trees without the United States' consent is unlawful and constitutes a trespass.  *See, e.g.*, *Northern Pac. R. Co. v. Lewis*, 162 U.S. 366, 374 (1896) (noting that the public lands were "owned by the United States, and the trees growing thereon were its absolute property, as much so as any other article of property possessed by the government.  Entering upon those lands by the plaintiffs for the purpose of cutting trees was a plain act of trespass, illegal in its nature [because] title to the standing timber was in the United States.").

The United States' "injury in fact" is analogous to, and even more direct and imminent than, the threat of injury that the Tenth Circuit found was sufficient to establish New Mexico's standing in *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009). In that case, New Mexico challenged a federal agency plan that opened an area to future oil and gas leasing by third parties on lands that the State did not even own. The Tenth Circuit held that New Mexico had standing "because of the threat of environmental damage to lands within its boundaries," even though the Federal agency had not yet authorized or approved any ground-disturbing activities. *Id.* at 696 n.13. Here, by usurping the United States' "jurisdictional supremacy," the New Mexico Statute effectively opens lands actually owned by the United States to the County's timber harvesting activities and, by delegating that usurped authority to the County, grants the County the immediate authorization to conduct those activities and cause environmental and myriad other harms to the United States, eliminating contingencies (i.e., future leasing and subsequent approval of a plan of operations) that were present in *New Mexico ex rel. Richardson*.

On their face, the New Mexico Statute and Otero County Resolution purported displacement of Federal "jurisdictional supremacy," making the State the paramount power in cutting and removing trees and underbrush on the National Forest System lands that the County has declared a disaster area. Just as States may challenge Federal action that purports to preempt state law before that action is actually implemented or enforced, the United States does not have to wait until its property is physically harmed to challenge the New Mexico Statute's purported preemption of Federal law. For example, the Tenth Circuit in *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008), applied this principal in holding that Wyoming had suffered an "injury in fact" for Article III standing purposes where a Federal action interfered

with the State's implementation of State law because "Federal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy this prong" for the State to seek to protect its sovereign interests.  Although the roles here are reversed, the United States has suffered an "injury in fact" to its sovereign interests because, by purporting to preempt Federal law (including the U.S. Constitution) governing the use of the United States' property, the New Mexico Statute and Otero County Resolution interfere with the United States' implementation of its laws.  On this basis, the United States has suffered an "injury in fact."  Because the "causation" and "redressability" prongs are not in question, the United States has standing to pursue its claims.

Even if the United States were not seeking to protect its paramount sovereign interests, the record demonstrates that it satisfies the "injury in fact" prong as that prong might apply to a private party.  In finding that the United States had not established "injury in fact" at the pleading stage, this Court was concerned with the County's denial of the allegation that "it will continue implementing the Garrett Plan without approval by the Forest Service."  ECF No. 49 at 4.[4]  The County, however, no longer denies that it fully intends to take "physical action" to implement the Garrett Plan without permission from the Forest Service because it has been "rebuffed" by the

---

[4] The Court was also concerned with the County's denial of the allegation that "the County has claimed ownership of all the National Forest System lands in Otero County."  ECF No. 49 at 4. While the County had previously advised the Forest Service that the County (or the State) was the true owner of these lands, Trujillo Decl. ¶ 9, the County now apparently concedes that the United States owns the lands comprising the Lincoln National Forest.  *See* Rardin Decl., ECF No. 64-1 ¶ 5 (stating that the County had tried to work cooperatively with "the landowner" [i.e., the United States] to implement the Garret Plan but had "ultimately been rebuffed").  The United States anticipated that the County's claimed ownership of National Forest System lands would be a defense to the United States' lawsuit.  Now that the County has abandoned the defense of "County ownership" and has proceeded only with a Tenth Amendment defense that the County's alleged "police powers" override the United States' property interests and the Property and Supremacy Clauses of the U.S. Constitution, *see* ECF No. 64 at 6-16, the County's former claim of ownership is no longer material to resolution of this lawsuit.

Forest.  *See* Rardin Decl., ECF No. 64-1 ¶ 5-6.  The Forest Service confirms that the County has unequivocally, repeatedly, and forcefully indicated that the County will implement the Garrett Plan to cut and remove trees and other property of the United States from the United States' lands without authorization from the Forest Service.  *See* Trujillo Decl. ¶¶ 20, 49-50, 55-56.[5]

Based on the County's earlier denials, the Court appeared concerned that the injury to the United States was not sufficiently "actual or imminent" for standing purposes.  ECF No. 49 at 3.  The Court distinguished *United States v. Colo. Sup. Ct.*, 87 F.3d 1161 (10th Cir. 1996), because here the New Mexico Statute did not require the United States to do, or refrain from doing, anything with its property, and did not prescribe criminal penalties.  ECF No. 49 at 4.  On the contrary, the Court noted, it was the County that would violate Federal law and subject itself to potential criminal prosecution if it moved forward with the Garrett Plan without Forest Service authorization.  *Id.* at 5 (citing 36 C.F.R. §§ 261.6 and 261.1b).[6]

The record before the Court establishes that the threat to the United States and its property is real, substantial, and imminent.  Otero County believes that the exercise of its police power -- as invoked in the Resolution through operation of the New Mexico Statute -- trumps the United States' authority over the United States' lands and property and is not subject to Federal control and authority.  Therefore, Federal law (such as the Forest Service regulations referenced

---

[5] Furthermore, this would not be the first time that a subdivision of New Mexico government acted similarly in violation of Federal law, the Supremacy Clause, and Property Clause.  *See, e.g., Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (illegal seizing of wild burros); *N.M. Attorney General Opinion No. 94-01,* 1994 WL 377669 (Apr. 18, 1994). (Opining that various New Mexico county ordinances were unconstitutional because they violate the Supremacy Clause).

[6] The Court also distinguished *United States v. Nye County, Nevada*, 920 F. Supp. 1108 (D. Nev. 1996), because here the County has not taken physical action in the face of any cease and desist order from the Forest Service.  ECF No. 49 at 4.  The *Nye County* court, however, did not address whether something less than a physical invasion would have established an "injury in fact."  As discussed herein, a physical invasion is not necessary for the United States to establish standing.

by the Court) does not stand as an impediment to the County's implementation of the Garrett Plan because the County believes that it is not subject to that law.  Trujillo Decl. ¶¶ 7-9, 13, 25, 36, 50, 51.  As a result, Otero County has repeatedly advised the Forest Service and the public (and now the Court, in sworn testimony) that it will implement the Garrett Plan without Forest Service authorization.  Trujillo Decl. ¶¶ 20, 49-50, 55-56.  Indeed, at the time the United States filed this lawsuit, Otero County had already held its "kick off" event for the Garrett Plan, the Forest Service had advised Otero County that implementation of the Garrett Plan was inconsistent with Federal law, and the County was poised to continue implementing the Garrett Plan without the consent of the Forest Service.  Moreover, the County and the County Sheriff have indicated that the Sheriff will arrest any Forest Service employee or officer who attempts to interfere with implementation of the County's Plan.  Trujillo Decl. ¶¶ 10, 53-54.

Under these circumstances, the threats to the United States, its property, its employees, and its sovereign interests in the management of National Forest System lands easily cross any threshold between "conjectural or hypothetical" and "actual or imminent."  *Lujan*, 504 U.S. at 560.  The United States did not need to wait for the County to trespass on the United States' lands and destroy the United States' property before filing this lawsuit.  "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."  *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) (citations omitted).  "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough."  *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).

The County must be taken at its word that, absent relief from this Court, the County will enforce its Resolution and begin implementing the Garrett Plan without the Forest Service's consent.  There is no contrary evidence in the record.  "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  Because the United States owns the trees on the Lincoln National Forest, once the County cuts a single tree without the Forest Service's permission the United States is irreparably harmed.  Moreover, implementation of the Garrett Plan without consent will constitute a trespass on federal public lands, will injure the environment, and will harm species protected under the Endangered Species Act.  Trujillo Decl. ¶¶ 7-8, 13, 18, 28-44.  Although harm need not be irreparable to establish standing, all of these harms are generally considered irreparable.  *See, e.g.*, *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, --- F.3d ---, No. 13-35653, 2014 WL 1814172, at *6 (9th Cir. 2014) ("The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all.").  The County's threat of arresting Forest Service employees makes the risk of injury to the United States all the more real and substantial, as those employees will be put in the untenable dilemma of either risking a dangerous law enforcement standoff with the County Sheriff or ignoring their duty to prevent an unlawful trespass and the damage and theft of Federal property.[7]  Indeed, because Otero County's threat of moving forward with implementation of the

---

[7] As the Supreme Court noted in the seminal case holding that the United States did not need to suffer a pecuniary loss to establish standing to protect its sovereign property interests:

Garrett Plan without the consent of the Forest Service forced the Forest Service to approve the "kick off" event project to diffuse a potentially dangerous law enforcement standoff, *see* Trujillo Decl. ¶ 20, the Forest Service has already been actually harmed.  *Accord United States v. Colo. Sup. Ct.*, 87 F.3d 1161, 1164 (10th Cir. 1996) ("By alleging that federal prosecutors have changed their practice in order to follow this rule, the United States has alleged a concrete, particularized, and actual injury in fact.").

The United States has standing to pursue its claims because the actions of the State and the County are directly and solely directed at the United States' sovereign interests, the purported usurpation of the United States' "jurisdictional supremacy" has already occurred, and Otero County's threatened intrusion on the United States' property in contravention of Federal law is real and imminent.  As one court stated in holding that the United States had standing "to protect its own lands" from an activity in a National Forest that had not yet occurred because "[w]here the public health or welfare is threatened, the government need not wait until after the damage has occurred in order to act, even if there happen to be criminal penalties associated with the behavior causing the threat."  *United States v. Rainbow Family*, 695 F. Supp. 314, 326-27 (E.D. Tex. 1988).  "The purpose of the injury-in-fact requirement of Article III is to ensure only those having a 'direct stake in the outcome,' and not those having abstract concerns, may have access

---

So, in the case before us, the right to use force does not exclude the right of appeal to the courts for a judicial determination, and for the exercise of all their powers of prevention. Indeed, it is more to the praise than to the blame of the government that, instead of determining for itself questions of right and wrong on the part of these petitioners and their associates, and enforcing that determination by the club of the policeman and the bayonet of the soldier, it submitted all those questions to the peaceful determination of judicial tribunals, and invoked their consideration and judgment as to the measure of its rights and powers, and the correlative obligations of those against whom it made complaint.

*In re Debs*, 158 U.S. 564, 583 (1895).

to the courts."  *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451 (10th Cir. 1996)

(quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454

U.S. 464, 473 (1982)).  The United States is the party with standing, and this Court should thus

proceed to the merits of the United States' claims.

## II.   THE STATE OF NEW MEXICO AND OTERO COUNTY HAVE NO AUTHORITY TO DIVEST THE UNITED STATES OF ITS JURISDICTION AND POWER OVER FEDERAL PUBLIC LANDS

The Property Clause of the U.S. Constitution provides that "Congress shall have Power to

dispose of and make all needful Rules and Regulations respecting the Territory or other Property

belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  The United States holds federal

public lands "as trustee for the people of the United States" and is entitled to "maintain its

possession and to prosecute trespassers."  *Camfield v. United States*, 167 U.S. 518, 524 (1897).

Pursuant to the Property Clause, the United States has exercised its right to retain, administer,

and protect federal public lands, including the areas of the Lincoln National Forest at issue in this

litigation which were reserved by Presidential Proclamation on April 24, 1907.  35 Stat. 2127.

Congress' power under the Property Clause to enact legislation pertaining to federal

public lands administered by the federal land management agencies is exclusive and without

limitation.

> The power over the public land thus entrusted to Congress is without limitations. And it is not for the courts to say how that trust shall be administered.  That is for Congress to determine.

*Alabama v. Texas*, 347 U.S. 272, 273 (1954) (per curiam) (quotation marks and citations

omitted).  Pursuant to the Property Clause, "[t]he United States can prohibit absolutely or fix the

terms on which its property may be used."  *Light v United States*, 220 U.S. 523, 536 (1911).

"These are rights incident to proprietorship, to say nothing of the power of the United States as a

16

sovereign over the property belonging to it." *Id.* at 537.  More to the point, "the government is charged with the duty and clothed with the power to protect the public domain from trespass and unlawful appropriation." *Id.* at 536 (quotation omitted).  In addition, the "[p]ower to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution." *Royal Indem. Co. v. United States*, 313 U.S. 289, 294 (1941) (citing U.S. Const. art. IV, § 3, cl. 2).  *See also Rio Grande Silvery Minnow v. U.S. Bureau of Reclamation*, 599 F.3d 1165, 1185 (10th Cir. 2010) ("The Property Clause of the Constitution invests Congress with plenary power to dispose of real property belonging to the United States.") (internal quotation marks and citation omitted).[8]

> The Supremacy Clause of the U.S. Constitution provides:
>
> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art VI, cl. 2.  In conjunction, the Supremacy Clause and Property Clause dictate that any State laws that conflict with Congress' exercise of its authority over federal public lands -- such as the New Mexico Statute purporting to divest the United States of its jurisdiction over federal lands and of Congress' plenary authority over that land -- must yield.  The Supreme Court has frequently stressed that a State has no authority to interfere with the use and disposal of federal public lands.  For instance, in *Gibson v. Chouteau*, 80 U.S. 92, 99 (1871), the Supreme Court stated that, under the Property Clause, "Congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made [and n]o State legislation can interfere

---

[8] "Plenary" is defined as "[f]ull, entire, complete, absolute, perfect, unqualified." *Black's Law Dictionary*, p. 1154 (6th.Ed. 1990).

with this right or embarrass its exercise."  Similarly, in *Van Brocklin v. Tennessee*, 117 U.S. 151, 168 (1886), the Supreme Court held that, under the Property Clause, Congress "has the exclusive right to control and dispose of" all "public and unoccupied lands, to which the United States have acquired title," and that "no state can interfere with this right, or embarrass its exercise."

In the seminal case of *Utah Power & Light Co. v. United States*, 243 U.S. 389 (1917), the defendant states and state agencies claimed that they could occupy and use federal public lands without obtaining permission from the federal agencies managing those public lands.  The state agencies argued that "their claims must be tested by the laws of the state in which the lands are situated rather than by the legislation of Congress" and that federal public lands "are subject to the jurisdiction, powers, and laws of the state in the same way and to the same extent as are similar lands of others."  *Id.* at 403-04.  The Supreme Court squarely rejected these arguments:

> Not only does the Constitution (art. 4, § 3, cl. 2) commit to Congress the power 'to dispose of and make all needful rules and regulations respecting' the lands of the United States, but the settled course of legislation, congressional and state, and repeated decisions of this court, have gone upon the theory that *the power of Congress is exclusive*, and that only through its exercise in some form can rights in lands belonging to the United States be acquired.

*Id.* at 404 (emphasis added).

The *Utah Power* Court explained that, while "for many purposes a state has civil and criminal jurisdiction over lands within its limits belonging to the United States," the State's jurisdiction "does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may obtain rights in them."  *Id.*  Thus, while a State may punish public offenses and tax activities that occur on federal lands, a State may *not* "invest others with any right whatever in them."  *Id.* (citations omitted).  The Supreme Court thus concluded that "state laws, including those relating to the

18

exercise of the power of eminent domain, have no bearing upon a controversy such as is here presented, save as they may have been adopted or made applicable by Congress." *Id.* at 405.

As explained in *Utah Power*, the State of New Mexico does not have any power to wrest away the United States' jurisdiction and exclusive authority over the occupancy and use of federal public lands.  Nor can the State of New Mexico unilaterally confer on its counties, including Otero County, the authority to use federal public lands.  In rejecting the notion that the laws of a State purporting to dispose of federal public lands could be "paramount to those of Congress, in relation to a subject confided by the Constitution to Congress only," the Supreme Court established long ago that State legislation cannot "take from the United States their own land, against their own will, and against their own laws."  *Wilcox v. Jackson*, 38 U.S. 498, 517 (1839).  "We hold the true principle to be . . . that whenever the question in any Court, state or federal, is, whether a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States."  *Id.*[9]

The Property Clause vests the power over the disposal and use of federal public lands solely in Congress, and the Supremacy Clause bars the State of New Mexico from usurping that power.  Because the United States cannot "forfeit" its "jurisdictional supremacy" over National Forest System lands, the New Mexico Statute is unconstitutional on its face.[10]  Nor can the New

---

[9] *See also, e.g.*, *BF Partners, LLC. v. Estate of McSorley*, No. 103CV353, 2005 WL 1335150, at *5 (W.D. Mich. June 6, 2005) ("To permit a state to foreclose upon federal property, stripping the federal government of their ownership by operation of a state law procedure, absent the consent of Congress, would be in direct contravention to the Supremacy Clause."); *Nourachi v. United States*, 632 F. Supp. 2d 1101, 1112-13 (M.D. Fla. 2009) ("This argument fails as a matter of law, because . . . a state statute[] cannot divest the United States of its property rights.  To hold otherwise would violate Article IV, Section 3, clause 2, of the United States Constitution giving Congress the power to legislate disposition of property of the United States.") (citations omitted).

[10] While the New Mexico Statute's declaration that the United States has failed to properly maintain National Forest System lands is not accurate, even if such an allegation were true,

Mexico Statute "empower" Otero County or any other county to take unilateral action on National Forest System lands, and thus the Otero County Resolution is also unconstitutional on its face.  Pursuant to *Utah Power*, the State of New Mexico has no authority to "invest others with any right whatever" in lands of the United States, 243 U.S. at 404, as the New Mexico Statute attempted to do here.  For these reasons alone, the United States is entitled to judgment on its claims, and the Court should declare the New Mexico Statute and the Otero County Resolution unconstitutional, invalid, null, and void.

### III. THE NEW MEXICO STATUTE AND OTERO COUNTY RESOLUTION VIOLATE FEDERAL LAW GOVERNING THE USE OF NATIONAL FOREST SYSTEM LANDS

In addition to the unconstitutionality of New Mexico's attempt to divest the United States of a power granted exclusively to Congress under the Property Clause, the New Mexico Statute and the Otero County Resolution also cannot stand because they directly conflict with Congress' exercise of its Property Clause power over National Forest System lands.  The Supremacy Clause not only bars usurpation of Congress' constitutional powers, it also "invalidates state laws that 'interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the [C]onstitution.'"  *United States v. City and Cnty. of Denver*, 100 F.3d 1509, 1512 (10th Cir. 1996) (quoting *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991)).

Utilizing its authority under the Property Clause, Congress provided for the reservation of certain Federal lands for National Forest System purposes.  Creative Act of 1891, Ch. 561, § 24,

---

"neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest."  *Utah Power*, 243 U.S. at 409 (citations omitted).  "A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it."  *Id.* (citation omitted).

26 Stat. 1095, 1103, 16 U.S.C. § 471.[11]   In the Forest Service Organic Administration Act of 1897, Congress proscribed the establishment of forest reservations to "improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States."  16 U.S.C. § 475.  Pursuant to this authority, President Theodore Roosevelt designated most of the National Forest System lands at issue in this litigation as part of the Sacramento National Forest in 1907, 35 Stat. 2127, and these lands subsequently became part of the Lincoln National Forest.

The 1897 Organic Administration Act originally delegated the responsibility for managing public lands to the Secretary of the Interior, providing that the Secretary:

> shall make provisions for the protection against destruction by fire and depredations upon the public forests and forest reservations . . .; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely to regulate their occupancy and use and to preserve the forests thereon from destruction . . .

30 Stat. 35, 16 U.S.C. § 475.  In 1905, Congress transferred responsibility for managing National Forest System lands to the Secretary of Agriculture.  16 U.S.C. §§ 472, 551.  As with the 1897 Organic Administration Act, Congress directed the Secretary of Agriculture to "make provisions for the protection against destruction by fire and depredations upon the public forests and national forests" and to make rules and regulations governing "their occupancy and use and to preserve the forests thereon from destruction."  16 U.S.C. § 551.  This authority was in turn delegated to the Under Secretary for Natural Resources and Environment and then to the Chief of the Forest Service.  7 U.S.C. § 6961; 7 C.F.R. § 2.60(a).  Congress thus expressly assigned to the Department of Agriculture and Forest Service the very responsibility that the New Mexico

---

[11] This provision was repealed in 1976 by the Federal Land Policy and Management Act, 90 Stat. 2743, 2792 (1976).

Statute purports to usurp--"protection [of the National Forests] against destruction by fire."  16 U.S.C. § 551.

In accordance with its mandate from Congress to protect National Forests from "destruction by fire" and "depredations," and to "regulate their occupancy and use," the Department of Agriculture has promulgated regulations governing National Forest System lands. "The Organic Act gives the Forest Service broad discretion to regulate the national forests, including for conservation purposes." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1234 (10th Cir. 2011).[12]  Among other things, Forest Service regulations prohibit:

- "[c]utting or otherwise damaging any timber, tree, or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," 36 C.F.R. § 261.6(a);

- "[r]emoving any timber, tree or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," 36 C.F.R. § 261.6(h);

- damaging or removing "any natural feature or other property of the United States," 36 C.F.R. § 261.9(a)-(b);

- disturbing the surface of National Forest System lands "without a special-use authorization, contract, or approved operating plan when such authorization is required," 36 C.F.R. § 261.10(a);

- "conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization," 36 C.F.R. § 261.10(c); and

- using or occupying National Forest System lands without special-use authorization when such authorization is required, 36 C.F.R. § 261.10(k).

---

[12] *See also id.* (stating that the Organic Act "reveals a clear intent of Congress to commit regulation of the national forests to the discretion of the Secretary [of Agriculture]") (quoting with approval *Mountain States Tel. & Tel. Co. v. United States*, 499 F.2d 611, 614 (Ct. Cl. 1974)).

With regard to timber projects, the regulations include extensive and detailed provisions governing the Forest Service's authority to grant or deny permission for such projects. 36 C.F.R. Part 223. For example, the approving Forest Service officer must insure that all timber projects are consistent with the applicable Forest Plan and "environmental quality standards" and include requirements for, *inter alia*, "[f]ire protection and suppression" and "[m]inimizing adverse effects on, or providing protection for and enhancing other National Forest resources, uses and improvements." 36 C.F.R. § 223.30.

In attempting to sidestep the Forest Service approval process, the New Mexico Statute is in direct conflict with federal laws and regulations governing National Forest System lands. While the New Mexico Statute requires "consulting" with the "regional United States forester," it does not require a county to obtain authorization from the appropriate Forest Service officer prior to the county "tak[ing] such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster" on National Forest System lands. NMSA § 4-36-11(C), ECF No. 1-1. The Otero County Resolution asserts that the County is "empowered" by the New Mexico Statute to take these actions. Resolution #05-23-11/99-50, ECF No. 1-2 at 2. By authorizing the cutting and removal of timber and other resources on the National Forests in New Mexico without Forest Service permission, the New Mexico Statute and Otero County Resolution not only conflict with Federal statutes and regulations governing such actions, they *violate* provisions such as 36 C.F.R. § 261.6(a), which prohibits "[c]utting or otherwise damaging timber, trees, or other forest product[s]" on National Forests without authorization from the Forest Service. Congress has also directly criminalized the type of actions Otero County intends to take:

> Whoever unlawfully cuts, or wantonly injures or destroys any tree growing, standing, or being upon any land of the United States which, in pursuance of law,

> has been reserved or purchased by the United States for any public use . . .
> *without the consent of the United States*, shall be fined under this title or
> imprisoned not more than one year, or both.

18 U.S.C § 1853 (emphasis added).

The United States has the power of a sovereign to protect its lands, "to control their use, and to prescribe in what manner others may obtain rights in them," even "though this may involve the exercise in some measure of what commonly is known as the police power." *Utah Power*, 243 U.S. at 404-05. The power granted under the Property Clause is "analogous to the police power of the several states." *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976). "[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, [the Supreme Court has] repeatedly observed that '(t)he power over the public land thus entrusted to Congress is without limitations.'" *Id.* at 539 (citation omitted); *see also Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987) (holding that "the Property Clause gives Congress plenary power to legislate the use of . . . federal land"); *United States v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1996) (stating that "the United States can administer its federal lands any way it chooses"); *Nye Cnty.*, 920 F. Supp. at 1117 (recognizing the "broad power of the federal government to retain and regulate public lands") (citing *Kleppe*, 426 U.S. 529).

"The United States can prohibit absolutely or fix the terms on which its property may be used." *Light*, 220 U.S. at 536; *see Kleppe*, 426 U.S. at 540 ("In short, Congress exercises the powers both of a proprietor and of a legislature over the public domain.") (citations omitted). As noted above, Congress has the sole power to "control [the] occupancy and use" of Federal lands, and state law cannot take that power from Congress. *Utah Power*, 243 U.S. at 405; *see also id.* at 404 (holding that a state's jurisdiction "does not extend to any matter that is not consistent

24

with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may obtain rights in them"); *Van Brocklin*, 117 U.S. at 168 (holding that, under the Property Clause, Congress "has the exclusive right to control and dispose of" all "public and unoccupied lands, to which the United States have acquired title," and that "no state can interfere with this right, or embarrass its exercise") (quotation marks and citations omitted).

The United States does not, however, claim exclusive jurisdiction over National Forest System lands, and the State has jurisdiction to enforce its criminal and civil laws on those lands within its borders. *Wyoming v. United States*, 279 F.3d 1214, 1226 (10th Cir. 2002); 16 U.S.C. § 480 (state retains civil and criminal jurisdiction on National Forest System lands). "But where those state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear:  The state laws must recede." *Kleppe*, 426 U.S. at 543 (citation omitted).

The Supreme Court's holding in *Kleppe* is controlling here.  At issue in *Kleppe* was the constitutionality of two conflicting statutes, the Wild Free-roaming Horses and Burros Act ("Wild Horses Act") and the New Mexico Estray Law.  Congress enacted the Wild Horses Act to "protect 'all unbranded and unclaimed horses and burros on public lands of the United States'" from "'capture, branding, harassment, or death.'"  426 U.S. at 531 (quoting 16 U.S.C. §§ 1331, 1332(b)).  The Act further directed the Secretary of the Interior and the Secretary of Agriculture through the Forest Service "'to protect and manage (the animals) as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecologic balance on the public lands'" and to promulgate regulations and "to enter into cooperative agreements with other landowners and with state and local governmental agencies in furtherance of the Act's purposes."  426 U.S. at 531-32 (quoting 16 U.S.C. § 1333(a) and citing 16 U.S.C. § 1336).  The New Mexico Livestock Board asserted that the Federal Government lacked power to control

25

wild horses and burros on the public lands of the United States and that, pursuant to the New Mexico Estray Law, the State had authority to take possession of horses and burros on State and Federal land.  426 U.S. at 533.  Based upon the authority of the New Mexico Estray Law, the Livestock Board rounded up and removed wild burros on public lands of the United States.  *Id.* at 533-34.

When the United States demanded that the Livestock Board recover the animals and return them to public lands, the State of New Mexico and the Livestock Board filed an action seeking a declaration that the Wild Horses Act was unconstitutional.  *Id.* at 534.  The Court held that the Wild Horses Act was constitutional under the Property Clause of the U.S. Constitution. *Id.* at 546.  The Court further held that since Congress passed the Wild Horses Act, the State's authorization to do what is forbidden under the Wild Horses Act is unconstitutional under the Supremacy Clause.  *Id.* at 543.

> Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause.  And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.  As we said in [*Camfield*], in response to a somewhat different claim:  "A different rule would place the public domain of the United States completely at the mercy of state legislation."

*Id.* (citations omitted; quoting *Camfield*, 167 U.S. at 526).

The *Kleppe* rule also applies to State laws that conflict with federal regulations.  "Federal regulations have no less preemptive effect than federal statutes."  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984) (internal quotation marks and citation omitted); *see also Wilderness Soc'y v. Kane County, Utah*, 560 F. Supp. 2d 1147, 1159 (D. Utah 2008) (noting that regulations and land management plans governing the management and use of federal public lands "have the same preemption effect that the statutes setting forth land management

objectives and policies have") (*overruled on other grounds*, 632 F.3d 1162 (10th Cir. 2011)). For instance, in *Sch. Bd. of Avoyelles Parish v. U.S. Dep't of Interior*, 647 F.3d 570 (5th Cir. 2011), the Fifth Circuit stated that "[i]nsofar as Louisiana law would permit the School Board to enter, use, or otherwise occupy Refuge lands in violation of [federal agency] regulations, Louisiana law is in direct conflict with federal law and is preempted." *Id.* at 582 (footnote omitted).

The New Mexico Statute's ostensible authorization for counties to enter National Forest System lands to cut and remove timber and other resources without Forest Service authorization conflicts with and violates Federal law, and constitutes a trespass. *See Utah Power*, 243 U.S. at 405. As noted above, the Supreme Court has unequivocally stated that "the power of Congress is exclusive, and . . . only through its exercise in some form can rights in lands belonging to the United States be acquired," and States cannot "invest others with any right whatever" in National Forest System lands. *Id.* at 404; *see also Duncan Energy Co. v. U.S. Forest Serv.*, 50 F.3d 584, 591 (8th Cir. 1995) (holding that to the extent that North Dakota property law can be interpreted to allow developers unrestricted access over Forest System lands, such law is inconsistent with special use regulations and is preempted).

In *Nye County*, for example, Nye County, Nevada, had adopted a resolution asserting that the County "owns the rights-of-way for all roads and corridors crossing public lands," and therefore had authority to manage the rights-of-way as it saw fit, acting upon its "denial that the United States owns and has authority to manage the public lands." 920 F. Supp. at 1109-10. The *Nye County* Court rejected the County's attempt to usurp the United States' authority over federal public lands, holding that "[t]he United States has shown that it has enacted a comprehensive right-of-way regulation" and that therefore the County's resolution "does violate

the Supremacy Clause to the extent that it applies to roads and other corridors for which no valid right-of-way exists under federal law." *Id.* at 1120.  Here, the New Mexico Statute and Otero County Resolution go even further in violating the Supremacy Clause, recognizing the United States' jurisdiction over federal public lands, but purporting to divest that jurisdiction from the United States and to grant authority to the counties to remove trees and damage other resources without Forest Service review and approval, in direct violation of the Federal laws outlined above. *See, e.g.*, *Utah Power*, 243 U.S. at 410 (holding that the states and their agents were "mistaken" in "the theory that the [congressional] act and all the regulations are without application to their situation" and were thus improperly "occupying and using reserved lands of the United States without its permission and contrary to its laws").

Because they directly conflict with Federal law and regulations governing the occupancy and use of National Forest System lands, the New Mexico Statute and Otero County Resolution are preempted and must be vacated and set aside pursuant to the Supremacy Clause.  On this basis as well, the Court should enter summary judgment in favor of the United States on both of its claims.

**IV.   THE NEW MEXICO STATUTE AND OTERO COUNTY RESOLUTION INTERFERE WITH IMPLEMENTATION OF THE COMPREHENSIVE CONGRESSIONAL REGIME FOR MANAGING THE NATIONAL FORESTS**

In addition to the direct conflicts and violations of Federal law discussed above, the New Mexico Statute and the Otero County Resolution are preempted because Congress has established a comprehensive legal regime governing the management of National Forest System lands, and the New Mexico Statute and Otero County Resolution stand as obstacles to implementation of that congressional regime.  Under the Supremacy Clause, state law can be preempted in three ways:  (1) Congress expressly preempts state law in the federal statute; (2)

Congress has shown an intent to occupy a given field such that any state law is preempted; or (3) state law actually conflicts with federal law such that "compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010). *See also Granite Rock*, 480 U.S. at 581; *City & County of Denver*, 100 F.3d at 1512. With respect to National Forest System lands, a review of Congress' comprehensive legal regime for National Forests demonstrates that Congress has intended to occupy the field of resource planning and management on National Forest System lands and that the New Mexico Statute and Otero County Resolution interfere with the Forest Service's implementation of this congressional regime.

### A. Congress Has Delegated The Authority To Manage The National Forest System To The Forest Service And Has Established A Comprehensive Legal Regime Governing The Use Of The United States' Property

As discussed above, Congress delegated management and protection of National Forest System lands to the Forest Service more than a century ago. *See* 16 U.S.C. § 551. In the century that followed, Congress has enacted an extensive statutory scheme directing how the Forest Service is to administer these lands. This Federal law comprises a carefully constructed framework delegating to the Forest Service the discretion for balancing the multiple uses on the National Forest System lands. *Wildearth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314, 1320-21 (D.N.M. 2009).

For example, in 1960, Congress enacted the Multiple-Use Sustained-Yield Act, which established that the Forest Service must manage National Forest System lands for outdoor recreation, range, timber, watershed management, fish and wildlife purposes, and wilderness in a manner that *the agency* deems will best meet the needs of the American people pursuant to the

principles of multiple-use and sustained yield.   16 U.S.C. §§ 528-31.   The Multiple-Use

Sustained-Yield Act "codified the multiple-use mandate first articulated in the Organic Act,

directing the Forest Service to 'administer the renewable surface resources of the national forests

for multiple use and sustained yield,' including for the purposes of 'outdoor recreation, range,

timber, watershed, and wildlife and fish purposes.'"   *Wyoming*, 661 F.3d at 1221 (quoting 16

U.S.C. §§ 528, 529).

The National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1600 *et seq.*,

carried forward the Forest Service's mandate to manage National Forest System lands pursuant

to multiple-use and sustained yield principals.   With NFMA, Congress established a detailed

framework for this management.   Under NFMA,

> [f]orest management occurs at two distinct levels.   At the first level, the Forest
> Service develops the Forest Plan, a broad, programmatic document, accompanied
> by an environmental impact statement and public review process conducted in
> accordance with [NEPA].   * * *   At the second level, the Forest Service
> implements the Forest Plan by approving (with or without modification) or
> disapproving particular projects . . . .   Proposed projects must be consistent with
> the Forest Plan and are subject to further [NEPA] review.

*Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167-68 (10th Cir. 1999); *see also Ohio Forestry

Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998) (discussing the two levels of National Forest

System lands planning and management pursuant to which the Forest Service authorizes timber

removal).

Congress has specified the mandatory contents of Forest Plans.   For example, Forest

Plans must "form one integrated plan for each unit of the National Forest System," 16 U.S.C.

§ 1604(f)(1), and establish broad planning goals and objectives and identify guidelines for

management of forest resources on each National Forest, ensuring consideration of both

economic and environmental factors.   *Id.* § 1604(g)(1)-(3).   Forest Plans must be developed and

maintained by using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." *Id.* § 1604(b).  Specifically, Forest Plans must provide for multiple-use and sustained-yield of the products and services obtained from the forests, "and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id.* § 1604(e)(1).  Forest Plans also must "insure that timber will be harvested from National Forest System land only where . . . soil, slope, or other watershed conditions will not be irreversibly damaged [and] protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water." *Id.* § 1604(g)(3)(E).  In addition to the Congressional direction, the Forest Service has promulgated regulations regarding the development of Forest Plans.

Moreover, when developing Forest Plans the Forest Service must comply with NEPA and other applicable environmental statutes, and the Plans are subject to public comment. *Id.* §§ 1604(d), (g)(1).  The NEPA analysis requires the Forest Service to take into consideration, among other things, the general welfare, the environmental impact of the action, and preservation of important historic, cultural, and natural aspects of our national heritage.  42 U.S.C. § 4332.

Following approval of a Forest Plan, forest planning and management continues with Forest Service review, approval or denial, and authorization of site-specific projects to move toward the desired conditions under the Plan. *Utah Envtl. Congress v. Bosworth,* 443 F.3d 732, 737 (10th Cir. 2006).  Project-level actions take many forms, and all such "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the [applicable Forest Plan]."  16 U.S.C. § 1604(i).  In addition to being consistent with the Forest Plan, proposals for site-specific projects -- including timber

removals and other forest resource treatments -- are subject to further analysis under NEPA and must comply with other environmental statutes.[13]

In the Healthy Forests Restoration Act of 2003 ("HFRA"), Congress specifically charged the Forest Service with reducing the risk of wildfire on National Forest System lands by planning and implementing fuel reduction projects.  16 U.S.C. § 6501 *et seq*.  As with other projects, hazardous fuel reduction projects must also be consistent with the Forest Plan, 16 U.S.C. § 6512(b), and must be reviewed and approved in accordance with applicable law, like NEPA.  16 U.S.C. § 6514(a).  However, "HFRA establishes an expedited administrative review process for authorized hazardous fuel reduction projects that does not use the full notice, comment, and appeal procedures applicable to most [Forest Service] actions under [Forest Service regulations]."  *Decker v. U.S. Forest Serv.*, 780 F. Supp. 2d 1170, 1172 (D. Colo. 2011) (citing 16 U.S.C. § 6515(a)(1) and 36 C.F.R. § 218.3).  As demonstrated above, Plaintiffs are incorrect in asserting that Congress has not passed comprehensive legislation govern the management of timber and fire hazards on National Forest System lands.  *See* ECF No. 64 at 14.

**B.  The Forest Service Has Promulgated Detailed Regulations To Implement The Comprehensive Federal Statutory Scheme Governing Management Of The National Forest System**

To help implement the comprehensive statutory scheme for management of the National Forests, the Secretary of Agriculture promulgates regulations governing the use and occupancy of the National Forest System lands.  Of relevance here, the regulations generally require a

---

[13] Some of the other myriad Federal laws governing the administration, management, and use of the National Forest System lands in New Mexico include, but are not limited to, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*; the Wilderness Act, 16 U.S.C. § 1131 *et seq.*; the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.*; the National Trails System Act, 16 U.S.C. § 1241 *et seq.*; the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331 *et seq.*; the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; the Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*; the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*; and the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

special use authorization for the use of National Forest System lands.  36 C.F.R. § 251.50.  One

of the requirements for a special use authorization is that it must be "consistent with the

standards and guidelines in the applicable forest land and resource management plan required

under [NFMA]."  *Id.* § 251.54(g)(3)(ii)(B).

Forest Service regulations prohibit "[c]utting or otherwise damaging any timber, tree, or

other forest product, except as authorized by a special-use authorization, timber sale contract, or

Federal law or regulation."  36 C.F.R. § 261.6(a).  The Forest Service is vested with authority to

sell timber:  "Trees, portions of trees, and other forest products on National Forest System lands

may be sold for the purpose of achieving the policies set forth in the Multiple-Use Sustained-

Yield Act [and NFMA], and the Program thereunder.  *Id.* § 223.1.  The Forest Service may

award timber sales contracts for the removal of timber from the National Forests without special

use permits.  *Id.* §§ 223.30-223.53.  Such contracts, however, are governed by an equally

stringent set of regulatory requirements.  As with special use permits, permission for use of

timber on National Forest System lands requires a finding that such permission is consistent with

the applicable Forest Plan.  *Id.* §§ 223.13, 223.30.

Under the Forest Service regulations, damaging or removing any natural feature or other

property of the United States is prohibited, 36 C.F.R. § 261.9(a)-(b), as is "significant surface

disturbance . . . on National Forest System lands . . . without a special-use authorization,

contract, or approved operating plan when such authorization is required," *Id.* § 261.10(a);

"conducting any kind of work activity or service unless authorized by Federal law, regulation, or

special-use authorization," *Id.* § 261.10(c); using or occupying National Forest System land

without special-use authorization when such authorization is required, *Id.* § 261.10(k); and

"[v]iolating any term or condition of a special-use authorization, contract or approved operating

plan," *Id.* § 261.10(l).  In other words, Federal statutes and regulations require that all uses of the National Forest System lands must be consistent with the Forest Plan, and both the uses and the Forest Plans must comply with environmental laws and Federal legislation governing the management of National Forest System lands.

> ### C.      State And Local Governments May Propose Projects And Participate In The Forest Service Planning Processes, But The Forest Service Is Vested With Final Authority To Manage National Forest System Lands

Congress has provided for the participation of state and local governments in the planning process for National Forest System lands.  For instance, NFMA requires the Forest Service to develop its Forest Plans in coordination "with the land and resource management planning processes of State and local Governments."  16 U.S.C. § 1604(a).  NFMA also instructs the Forest Service to share information to assist states "in proposing the planning for the protection, use, and management of renewable resources on non-Federal land."  *Id.* § 1605. Additionally, a state may submit a specific proposal for an action to the Forest Service.  If the state is unhappy with the Forest Service's response to the proposal, the state may seek further review through the administrative process and through the courts.  *Montanas for Multiple Use v. Barbouletos*, 542 F. Supp. 2d 9, 14-15 (D.D.C. 2008) *aff'd,* 568 F.3d 225 (D.C. Cir. 2009).

Under NEPA, state and local entities have the right to comment on proposed Federal actions. 42 U.S.C. § 4332(2)(c), and NEPA's implementing regulations provide that "[a]gencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements."  40 C.F.R. § 1506.2(b)-(c).  Thus, Congress provided for federal-state cooperation, but, in the end, the Forest Service retains the final authority to determine the best use of National Forest System lands.  *Granite Rock*, 480 U.S. at 597 (Powell, J., concurring in part and dissenting in part); *cf. Wyoming v. United States*, 279 F.3d

at 1234 (noting the preeminent federal role for Fish and Wildlife Service in the care and management of the National Wildlife Refuge System).

> **D.  The New Mexico Statute And Otero County Resolution Are Preempted By Congress' Comprehensive Legal Regime For The Management Of National Forest System Lands**

In addition to the direct conflicts with Federal statutory and regulatory provisions discussed in the previous section, Federal law preempts the New Mexico Statute and the Otero County Resolution for two reasons.  First, Congress has demonstrated its intent to occupy the field of National Forest System planning and management such that any state law purporting to do the same is preempted. Second, the New Mexico Statute and Otero County Resolution interfere with the accomplishment of Congress' purposes and objectives for the Forest Service's planning and management of National Forest System lands.

> **1.  Occupancy Of The Field Of National Forest Land And Resource Planning And Management**

As outlined above, Congress has consistently and comprehensively charged the Secretary of Agriculture and Forest Service with the authority and duty to manage and protect the use and occupancy of the National Forests.   Under this comprehensive congressional regime, the Secretary of Agriculture and Forest Service are directed, among many other things, to:

1) Make provisions "for the protection [of the National Forests] against destruction by fire" and governing "their occupancy and use," 16 U.S.C. § 551;

2) Manage the National Forests under the Multiple-Use Sustained-Yield Act for multiple uses in the balance that the Forest Service determines will best meet the needs of the American people, 16 U.S.C. §§ 528-31;

3) Develop, approve, and implement Forest Plans under NFMA, each of which must "form one integrated plan for each unit of the National Forest System," 16 U.S.C. § 1604(f)(1), and which must incorporate a host of standards and guidelines governing resource use and protection, including timber activities, *e.g.*, 16 U.S.C. § 1604;

4)      Develop and approve actions implementing Forest Plans, ensuring that those actions are consistent with the management regime the Forest Service established in the Forest Plan, 16 U.S.C. § 1604(i); and

5)      Reduce the risk of wildfire on National Forest System lands by planning and implementing fire hazard fuel reduction projects pursuant to HFRA, 16 U.S.C. § 6501 *et seq.*

Under its power pursuant to the Property Clause, Congress has enacted a detailed and comprehensive legal regime, demonstrating congressional intent to occupy the field of National Forest System planning and management, particularly with regard to timber harvesting and its use as a tool for protecting the natural resources of the National Forests.  And, in accordance with that congressional direction, the Department of Agriculture and Forest Service have promulgated extensive regulations and adopted Forest Plans governing the use of every unit of the National Forest System, including the Lincoln National Forest.

"Congress has the authority and responsibility to manage federal land.  By statute, Congress has delegated this authority to agencies such as the Forest Service who are obligated to oversee the management of national forest lands and protect the natural resources found therein." *United States v. Jenks*, 22 F.3d 1513, 1517 (10th Cir. 1994) (citing U.S. Const. art. IV, § 3, cl. 2). Under Congress' comprehensive legal regime for managing National Forest System lands in New Mexico there is no room for the State of New Mexico and Otero County to impose a different management regime.  The New Mexico Statute and Otero County Resolution are preempted by Federal law, and must be set aside pursuant to the Supremacy Clause.

> **2.      The New Mexico Statute And Otero County Resolution Are Obstacles To The Congressional Regime For Management Of National Forest System Lands**

Even if Congress had not completely occupied the field, the New Mexico Statute and Otero County Resolution stand as obstacles to the legal regime that Congress has established to

36

govern the planning, management, and use of National Forest System lands.  Under Congress'
legal regime, the Forest Service is responsible for protecting the National Forests from
devastating forest fires, for promulgating regulations, for determining how to balance timber
harvests with other multiple uses of the forest, for developing long-range Forest Plans, for
ensuring that timber harvest projects are consistent with the applicable Forest Plan, and for
meeting environmental and other concerns.  Under this regime, the State of New Mexico and
Otero County are afforded a role, but that role is one of coordination and cooperation.  *See, e.g.*,
16 U.S.C. § 1604(a).  The ultimate decision-making rests with the Forest Service.

The New Mexico Statute and Otero County Resolution turn this long-standing
congressional regime on its head.  Under these state and local provisions, instead of the Forest
Service determining how to manage the National Forest, the State of New Mexico and Otero
County have claimed control of the management of the National Forests.  Instead of the Forest
Service consulting and coordinating with the State and the County, the reverse would occur.  The
Federal statutes and regulations governing the real-world complexities of National Forest System
management are cast aside for a single-minded focus on fire prevention in a manner the State and
County solely deem acceptable.  Specifically, New Mexico has assumed and delegated to Otero
County the right to "clear and thin undergrowth and to remove or log fire-damaged trees within
the area of the disaster," ECF No. 1-1, without regard to the environmental impact of such
actions or the multiple uses of the forests -- making reducing the risk of wildfire the only interest
to be protected.  Congress has rejected this approach by requiring that even important projects
intended to address hazardous fire conditions must be consistent with the applicable Forest Plan
and comply with NEPA and other Federal law, such as the Endangered Species Act.  *See* 16
U.S.C. §§ 1604(a), 6512(b), 6514(a).

Despite New Mexico's "frustrations" with management of National Forest System lands, "the State may not pursue policies that undermine federal law," as the Supreme Court recently stated. *Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012);[14] *see also Minnesota v. Block*, 660 F.2d 1240, 1252 (8th Cir. 1981) (stating that pursuant to the Property and Supremacy Clauses, "congressional enactments obviously curtail or prohibit the State's prerogatives to make legislative choices respecting subjects the States may consider important") (internal quotation marks and citation omitted); *cf. Ventura Cnty. v. Gulf Oil Corp.*, 601 F.2d 1080, 1084 (9th Cir. 1979), *aff'd*, 445 U.S. 947 (1980) (holding county may not prohibit use of National Forest System lands "in an attempt to substitute its judgment for that of Congress"). In *Hunt v. United States*, 278 U.S. 96 (1928), for example, the Supreme Court upheld an injunction barring the State of Arizona's attempts to enforce state game laws on the Kaibab National Forest in a manner that would interfere with the Forest Service's actions to protect the National Forest from an excessive deer population. *Id.* at 99-101. The Supreme Court based its decision on the well-settled principle that state laws must yield to Congress' delegation of authority to the Forest Service, through the Secretary of Agriculture, to make decisions about how to manage National Forest System lands: "[T]he power of the United States to thus protect its lands and property does not admit of doubt . . ., the game laws or any other statute of the state to the contrary notwithstanding." *Id.* at 100.

-----

[14] *Arizona* involved a preemption situation dealing with immigration, where the Federal government has only "significant power," 132 S. Ct. at 2510, and not plenary power as Congress enjoys under the Property Clause. The New Mexico Statute is thus even more readily and clearly preempted here than in the immigration context at issue in *Arizona*, because the State of New Mexico has no authority to interfere with Congress' power to control the use of Federal lands. *See Utah Power*, 243 U.S. at 404.

Because they run contrary to the congressional regime governing the management of National Forest System lands, the New Mexico Statute and Otero County Resolution stand as obstacles to the accomplishment and execution of the full purposes and objectives of Congress. Through their actions, the State of New Mexico and Otero County seek to divest the United States of its jurisdiction and authority to determine how National Forest System lands are managed and used, to relegate the Forest Service to a consultation role instead of the decision-making role it was assigned by Congress, and to avoid the comprehensive Federal legal regime that the Forest Service must comply with when reviewing and authorizing actions of this nature on National Forest System lands.  The New Mexico Statute and Otero County Resolution are therefore preempted and unconstitutional under the Supremacy Clause.[15]  *Cf. Boundary Backpackers v. Boundary Cnty.*, 913 P.2d 1141, 1147-48 (Idaho 1996) (holding that portions of a county's ordinance that were contrary to Federal laws were preempted).  Accordingly, neither the New Mexico Statute nor the Otero County Resolution can stand as a valid exercise of the State of New Mexico's police power.

## V.   THE TENTH AMENDMENT DOES NOT ALLOW THE STATE OR OTERO COUNTY TO TRESPASS AND TAKE THE UNITED STATES' PROPERTY

In its summary judgment memorandum, Otero County makes only a single argument in defense of the New Mexico Statute and Otero County Resolution.  The County argues that, pursuant to the Tenth Amendment, the United States is barred from interfering with the State's exercise of its police powers, as delegated to the County, to abate an alleged nuisance caused by a fire hazard on the United States' lands and property.  ECF No. 64 at 6-16.  The County's Tenth

---

[15] As noted above, the New Mexico Attorney General has opined that various New Mexico County ordinances affecting Federal land, similar to the Otero County Resolution, are unconstitutional because they violate the Supremacy Clause.  *N.M. Attorney General Opinion No. 94-01,* 1994 WL 377669 (Apr. 18, 1994).

Amendment argument must be rejected because it flies in the face of the immense body of case law on this subject, including binding precedent from the Supreme Court and the Tenth Circuit.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.  The Supreme Court has recognized that the language of the Tenth Amendment is "essentially a tautology."  *New York v. United States*, 505 U.S. 144, 157 (1992).  "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *Id.* at 156.

The County's Tenth Amendment argument fails because, as discussed at length above and repeatedly established by the Supreme Court, the Property Clause of the U.S. Constitution vests Congress with exclusive and plenary power over the property of the United States.  *See, e.g.*, *Utah Power*, 243 U.S. at 404 (holding that under the Property Clause "the power of Congress [over lands of the United States] is exclusive"); *Granit Rock*, 480 U.S. at 581 (holding that "the Property Clause gives Congress plenary power to legislate the use of . . . federal land"); *Kleppe*, 426 U.S. at 539 (holding that "the power over the public land thus entrusted to Congress [under the Property Clause] is without limitations") (quotation marks and citation omitted).[16] Because the Constitution itself vests Congress with exclusive and plenary power over the National Forest System lands and the trees therein, "the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York*, 505 U.S. at 156.  The Tenth Amendment

---

[16] The County's assertion that the United States "is limited in its authority as having a proprietorial interest only" in the lands it owns, ECF No. 64 at 11, is frivolous, as this body of Supreme Court precedent dictates.  *See also Kleppe*, 426 U.S. at 540 ("Congress exercises the powers *both* of a proprietor and of a legislature over the public domain.") (citations omitted).

thus does not reserve in the State and the County any authority to use or control the use of the United States' property, regardless of whether they label it a "police power" or anything else. The authority for the State and County to cut and remove trees on National Forest System lands must come from Congress.

The County asserts that because the State has concurrent civil and criminal jurisdiction over the Lincoln National Forest, "the State can exercise its police power over [the] Lincoln National Forest to prevent an imminent danger or catastrophe."  ECF No. 64 at 10.  The County misconstrues the nature and extent of the State's concurrent jurisdiction.  While the State also may regulate the activities of private parties on National Forest System lands to some extent, it may do so only when such regulation does not undermine or conflict with the paramount powers of the United States over those lands.  *See, e.g.*, *Utah Power*, 243 U.S. at 404 ("True, for many purposes a state has civil and criminal jurisdiction over lands within its limits belonging to the United States, but this jurisdiction does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may obtain rights in them").[17]  Whatever the reach of the State's and the County's police powers on federal public lands, they do not afford the County a right to *use* those lands or the United States' property on them without the United States' permission.  The Property Clause delegates to the United States the sole and absolute power to determine whether and how National Forest System lands may be used, and whether trees and undergrowth that belong to the United States may be cut and removed.  Nor does the Tenth Amendment allow for a State to

---

[17] *See also Gardner*, 107 F.3d at 1320 (holding that a State has civil and criminal jurisdiction within its borders only "as long as it exercises its power in a manner that does not conflict with federal law"); *Minnesota*, 660 F.2d at 1252 ("This authority, like any other state police power, . . . must yield to any valid exercise of federal power."); *Granite Rock*, 480 U.S. 572 (subjecting State regulation of private mining operations on Federal land to preemption analysis).

affirmatively displace federal jurisdiction over Federal property.  Because the United States'
power in this regard is plenary, there can be no "inherent reserved police powers of New Mexico
under the Tenth Amendment" for the State to make its own such determination under the guise
of protecting the "health, safety, and welfare" of its citizens, as the County erroneously claims.
*See* ECF No. 64 at 14.[18]

   Based on these principals, the Tenth Circuit in *Wyoming v. United States*, 279 F.3d 1214
(10th Cir. 2002), readily rejected the same Tenth Amendment argument that the County is
making here.  In that case, the State of Wyoming sought to vaccinate elk on federal lands to
prevent the elk from spreading brucellosis (a serious disease that causes miscarriage) to domestic
cattle, but the U.S. Fish and Wildlife Service refused to allow the State to do so.  *Id.* at 1218.
Just as Otero County does here, Wyoming alleged that the United States' refusal violated the
Tenth Amendment by interfering with the State's "inherent sovereign authority [within its
borders] to manage, control, and regulate diseases in wildlife and domestic animals for the
health, safety and protection of its citizens."  *Id.* at 1223 (internal quotation marks omitted).  The
Tenth Circuit rejected this argument as "meritless," *id.* at 1226, because the Property Clause
"delegates to Congress ([and] thus the Tenth Amendment does not reserve to the States)" plenary
power over federal lands that "necessarily override and preempt conflicting state laws, policies,
and objectives" pursuant to the Supremacy Clause.  *Id.* at 1226-27 (relying on *Kleppe*, *Granite
Rock*, *Utah Power*, and *Camfield*).  "In view of the foregoing, we believe the point painfully
apparent that the Tenth Amendment does not reserve to the State of Wyoming the right to

---

[18] Otero County's attempt to use the Tenth Amendment to invade an area of plenary Federal
control is plainly a misapplication of that Amendment.  *See, e.g.*, *City of New York v. United
States*, 179 F.3d 29, 35 (2d Cir.1999) (holding that the Tenth Amendment is a "shield against the
federal government's using state and local governments to enact and administer federal
programs" not a "sword allowing states and localities to engage in passive resistence that
frustrates federal programs").

manage wildlife, or more specifically vaccinate elk, on the [federal lands], *regardless of the circumstances*." *Id.* at 1227 (emphasis added).  Thus, the State's professed urgency in exercising its alleged "inherent" police power over wildlife on federal lands was irrelevant to the Tenth Circuit's rejection of Wyoming's Tenth Amendment argument.

Otero County bases its Tenth Amendment "interference with state sovereignty" defense on the test outlined in *National League of Cities v. Usery*, 426 U.S. 833, 852-54 (1976).  *See* ECF 64 at 9-10.  The Supreme Court expressly overruled *National League* in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 557 (1985).  In any event, under any Supreme Court test in this arena, Otero County cannot demonstrate that application of the Property Clause, Supremacy Clause, or the laws and regulations governing National Forest System lands to protect the United States' property from destruction and theft offend the Tenth Amendment.  These constitutional and legal provisions apply to bar any unauthorized intrusion into the United States' sovereign property interests by any party, not just the State or the County.  The Supreme Court has drawn a clear distinction between federal laws that "regulate[] state activities" and those that "seek[] to control or influence the manner in which States regulate private parties."  *Reno v. Condon*, 528 U.S. 141, 150 (2000) (quoting *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)).  Federal laws that regulate state activity do not run afoul of the Tenth Amendment where, as here, they do not require the state to enact specific laws or regulations or require the state to aid in the enforcement of a federal law.  *See Reno*, 528 U.S. at 151; *New York*, 505 U.S. at 156; *United States v. City and County of San Francisco*, 310 U.S. 16, 29-30 (1940); *see also Connecticut v. Physicians Health Services Of Connecticut, Inc.*, 287 F.3d 110, 122 (2d Cir. 2002) ("Federal statutes validly enacted under one of Congress's enumerated

powers . . . cannot violate the Tenth Amendment unless they commandeer the states' executive officials or legislative processes.") (citations omitted).

*Reno* involved a challenge by the State of South Carolina to a federal statute that required states to restrict the disclosure of driver license records and imposed fines and penalties for failure to comply with the provisions. *Reno*, 528 U.S. at 146. In rejecting the argument that the law violated the Tenth Amendment by commandeering the state regulatory process, the Court explained that:

> Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.

*Id.* at 151 (quoting *South Carolina*, 485 U.S. at 514-15). Because the statute did not require the state to regulate its own citizens and did not require the state to enact any laws or regulations or require state officials to enforce federal statutes regulating private individuals, the Court held that it was "consistent with the constitutional principles enunciated in *New York* and *Printz* [*v. United States*, 521 U.S. 898, 933 (1997)]." 528 U.S. at 151.

*No* case has ever held that the requirements of laws enacted under the Property Clause to govern the protection and disposition of the United States' property do not apply to a State or a subdivision of a State. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 330-31 (1936) (holding that because the power over the United States' property is "expressly conferred" by the Property Clause, "it is manifest that the Tenth Amendment is not applicable"). In *City and County of San Francisco*, for example, the Supreme Court specifically rejected a claim that the City of San Francisco, as the owner of power production facilities in Yosemite National Park and the adjacent Stanislaus National Forest, could not as such be subjected to certain statutory

44

requirements regarding how power from the City facility was distributed.  310 U.S. at 30.  The

Court held that:

> Article 4, Section 3, Cl. 2 of the Constitution provides that 'The Congress shall
> have Power to dispose of and make all needful Rules and Regulations respecting
> the Territory or other Property belonging to the United States.'  The power over
> the public land thus entrusted to Congress is without limitations. * * * Congress
> may constitutionally limit the disposition of the public domain to a manner
> consistent with its views of public policy.  And the policy to govern disposal of
> rights to develop hydroelectric power in such public lands may, if Congress
> chooses, be one designed to avoid monopoly and to bring about a widespread
> distribution of benefits.  The statutory requirement that Hetch-Hetchy power be
> publicly distributed *does not represent an exercise of a general control over*
> *public policy in a State but instead only an exercise of the complete power which*
> *Congress has over particular public property entrusted to it.*

310 U.S. at 30 (emphasis added).  *See also Kleppe*, 426 U.S. at 541-42 (statute that protected

wild horses and burros on federal lands, thereby displacing New Mexico's estray laws on such

lands, was a proper exercise of Congress' power under Property Clause, not an interference with

state sovereignty); *City of Tombstone v. United States*, 501 Fed. Appx. 681, 682, 2012 WL

6758045, at *1 (9th Cir. 2012) (holding that, even "[a]ssuming without deciding that the Tenth

Amendment constrains the Forest Service's authority to regulate Tombstone's activities [on

National Forest System lands] under the Property Clause, no unlawful commandeering has been

shown" because "[t]here is no evidence that Tombstone was compelled 'to enact any laws or

regulations,' or 'to assist in the enforcement of federal statutes regulating private individuals'")

(quoting *Reno*, 528 U.S. at 151).

     The Tenth Amendment does not bar the United States from protecting its absolute and

paramount sovereign interests in protecting and controlling the use of its property against a

threatened invasion of those interests by the State and the County, regardless of any claims of a

need to abate an alleged fire hazard or public nuisance.  The Supreme Court and the Tenth

Circuit have rejected the County's position.  *See also Utah v. Garfield County,* 122 F. Supp. 2d

1201, 1234 (D. Utah 2000) (holding that "where Congress exercises the Property Power for purposes of managing the public lands, that exercise will be sustained even if it intrudes into subject areas that are traditionally a matter of state power, authority, and control").   Otero County's sole defense in this litigation is meritless, and its motion for summary judgment should be denied.

## CONCLUSION

For each and all of the foregoing reasons, the Court should declare that New Mexico Statute NMSA § 4-36-11 and Otero County Resolution #05-23-11/99-50 are unconstitutional, invalid, null, and void.   The United States respectfully requests that the Court deny Otero County's Motion for Summary Judgment, ECF No. 64, and grant the United States' Motion for Summary Judgment, ECF No. 70, setting aside the New Mexico Statute and Otero County Resolution, declaring that any actions taken by Defendants pursuant to the New Mexico Statute or Otero County Resolution on National Forest System lands, without prior approval and authorization from the Forest Service in accordance with federal law, are unlawful, invalid, and unconstitutional, and enjoining any actions taken by Defendants to further implement the New Mexico Statute or Otero County Resolution on National Forest System lands, without prior approval and authorization from the Forest Service in accordance with federal law.


Respectfully submitted this 4th day of June, 2014.

<div style="margin-left:40%">

DAMON P. MARTINEZ
United States Attorney
MICHAEL H. HOSES
Civil Chief
RUTH F. KEEGAN
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87103

</div>

46

(505) 346-7274
Michael.Hoses@usdoj.gov
Ruth.F.Keegan@usdoj.gov

SAM HIRSCH
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division


 /s/ Andrew A. Smith
ANDREW A. SMITH
Senior Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
P.O. Box 607
Albuquerque, New Mexico 87103
Phone:  (505) 224-1468
Fax:  (505) 346-7205
Andrew.Smith@usdoj.gov

*Of Counsel*:

STEVE HATTENBACH
Office of General Counsel
U.S. Department of Agriculture


## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2014, Plaintiff filed through the United States District Court ECF System the foregoing Notice to be served by CM/ECF electronic filing on all counsel of record.

 /s/ Andrew A. Smith
ANDREW A. SMITH
U.S. Department of Justice

47