## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

THE UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  No. 12-CV-0120 MCA/SMV

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF OTERO and THE
STATE OF NEW MEXICO,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Pacific Legal Foundation's Motion for Leave to File Brief Amicus Curiae [Doc. 83], Otero County's Motion for Summary Judgment [Doc. 63], and The United States' Motion for Summary Judgment [Doc. 70].   Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court DENIES Pacific Legal Foundation's Motion for Leave to File Brief Amicus Curiae, DENIES Otero County's Motion for Summary Judgment, and GRANTS The United States' Motion for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a challenge by Plaintiff United States of America to a 2001 statute enacted by Defendant State of New Mexico, N.M. Stat. Ann. § 4-36-11 (2001), and to a 2011 resolution (number 05-23-11/99-50) ("Resolution") enacted pursuant to the New Mexico statute by Defendant Otero County Board of County Commissioners ("Otero County/County").   The United States' Complaint for Declaratory and Injunctive Relief [Doc. 1] raises two counts.   The

first count seeks a declaration against the State of New Mexico that Section 4-36-11 is in conflict with and interferes with federal law, that Section 4-36-11 violates the Supremacy Clause of the United States Constitution, and that Section 4-36-11 therefore is preempted by federal law and is unconstitutional.   [*Id.* ¶ 55].   The second count seeks a declaration that the Otero County Resolution is in conflict with and interferes with federal law, that the Otero County Resolution violates the Supremacy Clause, and that the Otero County Resolution therefore is preempted by federal law and is unconstitutional.   [*Id.* ¶ 61].

The timing of the New Mexico legislature's passage of Section 4-36-11 in the early part of 2001 suggests that the legislature passed the statute in response to the disastrous Cerro Grande fires the previous year.   *See* Robert B. Keiter, *The Law of Fire:   Reshaping Public Land Policy in an Era of Ecology and Litigation*, 36 Envtl. L. 301, 360 (2006).   Subsection A of the New Mexico statute contains the following legislative findings:   (1) New Mexico citizens and officials "have repeatedly petitioned the United States forest service . . . to request that the forest service take appropriate action to remove or eliminate the conditions that have created a state of emergency . . . in and adjacent to national forests within New Mexico," N.M. Stat. Ann. § 4-36-11(A)(1); (2) "all the petitions have for all practical purposes been either ignored or discounted by the United States forest service," *id.* § 4-36-11(A)(2); (3) "it is a fundamental principle under the laws of any just society that the persistent failure of a sovereign to fulfill such obligations constitutes grounds for the forfeiture of jurisdictional supremacy," *id.* § 4-36-11(A)(3); (4) "such a forfeiture must hereby be recognized and declared," *id.*; and (5) "a jurisdictional vacuum" has been created because of the United States' forfeiture that "requires" New Mexico "to acknowledge its obligations as a sovereign power to protect the lives and property of its citizens and consequently to authorize any action it presently deems necessary to fill the vacuum created by the federal government by

2

assuming jurisdiction to reduce to acceptable levels, if not remove, the threat of catastrophic fires posed by present conditions in national forests," *id.* § 4-36-11(A)(4).   Subsection B comprises declarations of "a disaster within those areas of the national forests of New Mexico that suffered severe fire damage" where "large amounts of forest undergrowth have created the potential for damaging fires in the future" that is "of such magnitude that the police power of the state should be exercised to the extent necessary to provide the resources and services that will end the disaster and mitigate its effects."   *Id.* § 4-36-11(B).   Subsection C authorizes the board of county commissioners of a county in which a disaster has been declared after "consulting with the state forester and the regional United States forester, taking surveys, holding those public hearings as may be necessary and developing a plan to mitigate the effects of the disaster," to "take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damages trees within the area of the disaster."   *Id.* § 4-36-11(C).

Otero County adopted its Resolution on May 23, 2011, and entitled it, "RESOLUTION #05-23-11/99-50 DECLARING AN EMERGENCY IN OTERO COUNTY, NEW MEXICO DUE TO EXTREME DROUGHT, HIGH FIRE CONDITIONS, AND THE MAYHILL FIRE." [Doc. 1-2 at 1].   The relevant portions of the Resolution provide as follows:

> **NOW THEREFORE**, hereby be it resolved that the Board of County Commissioners of Otero County declares a state of emergency and disaster to exist in and around the communities and watersheds in the Sacramento Mountains including the . . . areas identified as critical in the Otero County Community Wildfire Protection Plan; and
>
> . . .
>
> **BE IT FURTHER RESOLVED** that the Board of County Commissioners hereby formally notifies State and Federal officials that pursuant to NMSA 1978 § 4-36-11C, it is empowered to, after consulting with the State Forester and the Regional United States

3

> Forester, taking surveys, holding those public hearings as may be necessary and developing a plan to mitigate the effects of the disaster, as a county in which a disaster has been declared pursuant to Subsection A of NMSA 1978 § 4-36-11 may take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster.

[*Id.* at 2].

The United States' Supremacy Clause challenge to the state statute and county Resolution rests on the language providing that the county need only "consult" with the United States Department of Agriculture ("USDA") Forest Service ("Forest Service") prior to clearing or thinning undergrowth or removing or logging trees on National Forest Service ("NFS") lands, and on the absence of language requiring the county to obtain Forest Service authorization, as required by federal law, prior to treating NFS lands.

Following its adoption of the Resolution, Otero County "contracted with Dr. Lawrence D. Garrett, Consultant, M3 Research, to complete a study and recommendation concerning thinning, restoration, fuels reduction, and return of the resource to pre-settlement conditions," [Doc. 71-1 at 4, ¶ 12 (internal quotation marks omitted)], and, in August 2011, Dr. Garrett completed a plan for the county's action titled, "A Restoration Plan for Landscape Reference Condition Treatments in Areas around Cloudcroft New Mexico" (the "Garrett Plan"), [*id.* at 5, ¶ 15]. "The Garrett Plan proposes to 'restore' 69,000 acres on the Sacramento Ranger District of the Lincoln National Forest." [*Id.* at 5, ¶ 18]. This restoration would entail removing primarily small and medium size (five to twelve inch at breast high and 20 to 60 feet tall) standing live and dead trees and wood materials. [*Id.*].

Ronnie Rardin ("Rardin") is a duly-elected Otero County Commissioner serving on the Otero County Board of County Commissioners who is authorized to make statements on behalf of

4

the board and on behalf of Otero County.  [Doc. 64-1 at 1, ¶ 1].  Rardin attests that Otero County intends to "continue to physically carry out the Garrett Plan until the threat to [its] citizens and their private property is resolved."  [*Id.* at 2, ¶ 6].  Rardin further asserts that "[Otero County] will continue to consult with [the Forest Service] and attempt to find cooperative solutions, but failing those type of cooperative solutions it is the County's intention to take physical action with or without the consent of the Forest Service."  [*Id.*].

Robert G. Trujillo, Ph.D. ("Trujillo") was employed by the Forest Service and served as the Forest Supervisor for the Lincoln National Forest at the time of the facts giving rise to this action.  [Doc. 71-1 at 1, ¶ 1].  In this capacity, Trujillo was "responsible for the management of the Lincoln National Forest in accordance with all laws, policies, and regulations that govern management of [NFS] lands, including the National Environmental Policy Act (NEPA), the Endangered Species Act, and the National Forest Management Act (NFMA)."  [*Id.*].  In his declaration, Trujillo attests that "[i]mplementation of [the Garrett Plan] without a permit would effectively deprive the Forest Service of the Agency's ability and duty to comply with numerous Federal laws and regulations, including NEPA, Endangered Species Act, NFMA, and the Clean Water Act (CWA)."  [Doc. 71-1 at 8, ¶ 30].[1]

In his declaration, Trujillo asserts that after Otero County passed the Resolution, Otero County commissioners announced the county's intention to cut trees on NFS lands and Otero

---

[1]  Trujillo further attests that the Garrett Plan is aimed only at reducing the risk of wildfire, and that it therefore interferes with the Forest Service's plans because federal plans respond to the multiple goals and objectives of not only (1) "reduc[ing] the risk of catastrophic wildfire," but also of (2) "restor[ing] functionality of a fire adapted ecosystem with the goal of improving sustainability," and (3) "improv[ing] forest health," "restor[ing] proper watershed function," "improv[ing] water quality and quantity," "improv[ing] native plant communities and biodiversity[] and threatened and endangered species abundance and diversity."  [Doc. 71-1 at 9, ¶ 33; *see also id.* at 9, ¶ 34].

County officials repeatedly asserted in meetings with Trujillo on May 24, and July 5, 2011, that Otero County did not need, and would not wait for, Forest Service approval to implement treatments on NFS lands. [*Id.* at 3, ¶¶ 6, 7]. Trujillo further declares that at a July 5, 2011 meeting, "Otero County Commissioner Chairman Ronnie Rardin, in the presence of the County Sheriff, threatened that the Sheriff [Benny House] would arrest Federal personnel if Federal personnel interfered with Otero County treatments on National Forest System lands." [*Id.* at 3-4, ¶ 10]. "On May 5, 2011, Patrol Captain Tim Bertrand informed [Trujillo] that [Bertrand] had been informed by Sheriff Benny House that Sheriff House did not recognize Forest Service authority or jurisdiction," and Trujillo asserts that "Sheriff House also reportedly has stated that [House] would arrest Forest Service law enforcement officers on kidnapping charges if those officers arrested anyone implementing Otero County's Project." [*Id.* at 13, ¶¶ 53-54].

Trujillo declares that on August 2, 2011, Forest Service officials met with Otero County officials who informed Forest Service representatives that "Otero County intended to move forward in developing a plan to cut and remove trees, logs, and undergrowth on National Forest System lands in Otero County and would not wait for" the Forest Service, [*id.* at 4, ¶ 11], to "fulfill the requirements of . . . Federal laws and regulations," even though the Forest Service offered to expedite this process, [*id.* at 3-4, ¶¶ 8, 11]. Trujillo further attests that, "[o]n August 25, 2011, Regional Forester, Corbin Newman, met with Commissioner Rardin and other Otero County officials" and following that meeting, "[Newman] relayed to [Trujillo] that it was Otero County's stated intention to develop and implement a plan to treat National Forest System lands in Otero County." [*Id.* at 4, ¶ 13]. Trujillo asserts that a week later, at a September 2, 2011, field meeting, Otero County officials provided Trujillo with the Garrett Plan, that he reviewed the executive summary of the Garrett Plan, and that the summary confirms that Otero County intends to

implement the treatments outlined in the plan.   [*Id.* at 5, ¶ 16].   At the meeting, Otero County officials also informed Trujillo that they were going to hold a "kick off" "emergency tree cutting" event on September 17, 2011, to start implementation of the Otero County project.   [*Id.* at 5, ¶ 17].

Trujillo declares that on September 8, 2011, Otero County held a meeting to inform the public about the Garett Plan and to garner public support for implementation of the plan, [*id.* at 7, ¶ 23], and Otero County "made clear to the Forest Service that Otero County would proceed with its 'kick off' event without Forest Service approval," [*id.* at 6, ¶ 20].   Trujillo asserts that although the Forrest Service consented to the kick-off event, it did so only because its scope fell within a previously-approved project and because the Forest Service wished to avoid a potentially dangerous confrontation.   [*Id.*].   On September 17, 2011, Otero County held its ceremonial "emergency tree cutting."   [Doc. 71 at 7, ¶ 6].   During this event, Otero County gave speeches in which it further confirmed its intention to implement treatments on NFS lands.   [*Id.* at 8, ¶ 7].

Trujillo explains that it was "Otero County's threats of implementing the Garrett Plan without Forest Service authorization [that] compelled [the Forest Service] to authorize th[e] 'kick-off' event, despite [the Forest Service's] reservations with it, in order to avoid putting [federal] employees at risk from the County's actions and from confrontations with the County Sheriff."   [Doc. 71-1 at 6, ¶ 20].   The Forest Service was thus forced "to diffuse a potentially tense and dangerous law enforcement situation by exploring potential locations and projects where all regulatory and policy requirements had been met."   [*Id.*].   To this end, the Forest Service identified the Sleepy Grass Campground Site, which consisted of less than one acre of land, as a potential site for the kick-off event, because the Forest Service had previously marked trees to be cut at this site in compliance with federal law but had not implemented this part of the project. [*Id.* at 6, ¶ 21].   Trujillo asserts that although the implementation of the broader Otero County

7

project outlined in the Garrett Plan would be inconsistent with and violate federal law, cutting trees on the one acre piece of land at the Sleepy Grass Campground Site would not violate federal law. [*Id.* at 6, ¶¶ 20, 21].

Trujillo attests that at an October 17, 2011, meeting, Rardin indicated that the county was "unwilling to wait for Forest Service approval of [its] proposed project."   [*Id.* at 12, ¶¶ 49-50]. Then, on November 17, 2011, Trujillo asserts that "Otero County submitted a new proposal calling for treatment of 1,200 to 1,500 acres on the Lincoln National Forest" in an area "within Mexican Spotted Owl (MSO) habitat with MSO present in the area."   [*Id.* at 12, ¶ 51].   Otero County expressed that this treatment needed to be completed by the Spring of 2012 and that Otero County would complete the treatment without regard to applicable environmental federal laws that protect NFS lands.   [*Id.* at 12-13, ¶ 51].

## DISCUSSION

This matter is before the Court on three motions:  Pacific Legal Foundation's ("PLF") Motion for Leave to File Brief Amicus Curiae [Doc. 83], Otero County's Motion for Summary Judgment [Doc. 63], and the United States' Motion for Summary Judgment [Doc. 70].   The Court initially addresses the question of the United States' standing to bring its claims for declaratory relief against the State of New Mexico and Otero County as well as the question of the ripeness of the United States' claims.   These questions implicate the Court's jurisdiction to hear the case.

Because the Court concludes that the United States has standing to bring its claims, the Court next decides PLF's Motion for Leave to File Brief Amicus Curiae.  That motion requires the Court to resolve the threshold question of whether to allow PLF to file its amicus brief containing arguments that PLF maintains will assist the Court in addressing the summary judgment motions, and the Court thus must answer this question prior to reaching the merits of the

motions for summary judgment.   As discussed herein below, the Court denies PLF's motion on the grounds that its proposed amicus brief injects a new legal question into this litigation, does not present any argument related to the legal questions before the Court on summary judgment, and therefore is not of assistance to the Court.

The Court thereafter considers the substantive two-part dispute between the United States and Otero County raised by their cross-motions for summary judgment.   The first aspect of this dispute requires the Court to examine the line between the powers delegated to the United States by the Property Clause of the Constitution and those police powers reserved to the states under the Tenth Amendment.   The Court concludes that the Property Clause grants the federal government plenary power over federal lands, and consequently that the Tenth Amendment does not reserve an exclusive sovereign right to New Mexico to regulate federal lands in contravention of federal law. With respect to the second aspect of the dispute, the Court concludes that the New Mexico statute and Otero County Resolution conflict with federal law and therefore are invalid pursuant to the Supremacy Clause of the United States Constitution.

The Court last turns to the dispute on summary judgment between the United States and New Mexico, and determines whether, consistent with New Mexico's argument in opposition to the United States' Motion for Summary Judgment, the Court can construe the consultation requirement of the New Mexico statute in a manner that does not conflict with federal law and therefore that does not violate the Supremacy Clause.   The Court concludes that New Mexico's proposed interpretation of the statute is not consistent with the statute's plain and unambiguous language or its legislative intent, and that New Mexico's argument therefore does not render the statute valid.

I.      The United States has Standing to Assert its Claims.

9

A plaintiff must satisfy three criteria to establish that it has standing within the meaning of Article III's "Cases" and "Controversies" requirement.   *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).   "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Gandy*, 416 F.3d at 1154 (quoting *Lujan*, 504 U.S. at 560).   "Second, there must be a causal connection between that injury and the challenged action of the defendant—the injury must be 'fairly traceable' to the defendant, and not the result of the independent action of some third party." *Id.* (quoting *Lujan*, 504 U.S. at 560).   "Finally, it must be likely, not merely speculative, that a favorable judgment will redress the plaintiff's injury."   *Id.* (citing *Lujan*, 504 U.S. at 561).

In the Court's Memorandum Opinion and Order dated September 23, 2013, [Doc. 49], the Court *sua sponte* raised the question of its power to hear this case.   Although the United States moved pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings, [Doc. 29], the Court held that it could not grant that motion because, as a threshold matter, the Court was obligated to ensure that the United States had standing to bring its claims.   [Doc. 49 at 3]; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (explaining that "whenever standing is unclear, [the court] must consider it *sua sponte* to ensure there is an Article III case or controversy before [it]") (citation omitted).   In particular, the Court expressed concern whether the United States could establish the first element of standing—namely, that it had suffered a threatened injury in fact.   [Doc. 49 at 3].   The Court explained that "Section 4-36-11 does not require the United States to take any action and it does not prohibit the United States from engaging in any activity on federal land now authorized by federal law.   Section 4-36-11 does not prescribe criminal penalties enforceable against federal officers."   [*Id.* at 4].   And, the Court

reasoned that "for a resolution adopted pursuant to § 4-36-11 to actually interfere with the United States' management of federal forest lands, some human agents of a county must be willing to engage in unauthorized timber cutting and clearing on federal land."   [*Id.* at 5].   Because a dispute of fact existed in the pleadings on the question whether any agents of the county were willing to engage in unauthorized timber cutting or clearing on federal land, however, the Court did not enter judgment on the pleadings in the United States' favor on the question of standing. [*Id.* at 5-6].

Under the Rule 12(b)(1) standard, which the Court applies to an issue of standing raised in a Rule 12(c) motion for judgment on the pleadings, the Court was authorized to consider evidence beyond the pleadings without converting the motion for judgment on the pleadings into a motion for summary judgment.   At the time, however, the parties had not provided the Court with the necessary facts for the Court to determine whether the record affirmatively supported the United States' standing.   *See Swepi, LP v. Mora County*, No. 14-CV-0035, 2015 WL 365923, *42 (D.N.M. Jan. 19, 2015) ("standing . . . must affirmatively appear in the record") (internal quotation marks and citation omitted).   Thus, the Court deferred ruling on the merits of the constitutionality of the statute and ordinance thereby allowing the parties to present the Court with the necessary facts to establish standing.   [Doc. 49 at 6].   The parties chose to bring the required facts before the Court in their cross-motions for summary judgment.   The Court now determines whether the United States has suffered a threatened injury in fact sufficient to provide it with standing to sue.

In deciding the question of standing at the summary judgment stage, the Court does not apply the Rule 12(b)(1) standard applicable at the pleading stage, but rather determines whether the United States has set forth by affidavit or other evidence specific facts that, if taken as true, establish each of the required elements of standing.   *See Lujan*, 504 U.S. at 561 (citing Fed. R.

Civ. P. 56(e)); *Gandy*, 416 F.3d at 1154.   Because it is only the first element of standing that the parties dispute, and it is clear to the Court that the United States can establish the second and third elements of standing, the Court confines its jurisdictional inquiry to an analysis of whether the United States, consistent with its burden, *see id.*; *Lujan*, 504 U.S. at 561, has satisfied the first element of standing:   *i.e.*, namely, whether the United States has presented facts which, if true, establish that it "suffered an 'injury in fact'—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Gandy*, 416 F.3d at 1154 (quoting *Lujan*, 504 U.S. at 560).

A.   The Court Overrules Defendants' Objections to the United States' Evidence.

To determine whether the United States has presented evidence which, if true, satisfies the first element of standing, the Court must address at the outset Defendants' objections to the evidence upon which the United States relies to establish standing.   Defendants first maintain that the Court should discount Trujillo's declaration because it is outdated.   [Doc. 78 at 5-6].   The Court is not persuaded.   Standing is assessed as of the time the United States filed suit, which was on February 7, 2012.   The statements in Trujillo's declaration are relevant to whether the United States suffered a threatened injury in fact at the time it filed suit.   Trujillo's declaration contains facts identifying statements of county officials that were made between May 2011 and the end of November 2011.   These statements transpired after the county passed its Resolution in May 2011 through the date the United States filed this suit, and they fall within the precise timeframe that is relevant to the standing inquiry.   The Court therefore rejects Defendants' contentions that the United States' evidence is outdated and should be discounted.

Defendants next argue that the Trujillo declaration is vague because Trujillo at times fails specifically to identify the names of the county representatives making statements to him but

12

rather only generally refers to the declarants as "County officials." [*Id.* at 5 (citing Doc. 71-1 at ¶ 70); Doc. 77 at 5]. The Court is not persuaded that the failure to identify specific county officials by name impacts the admissibility of the statements. Rather, the Court concludes that the statements contain other sufficient indicia of reliability to render them admissible.

Defendants last challenge Trujillo's assertions in paragraphs 13 and 54 on the ground that Trujillo "references out-of-court statements" and "second- and third-hand comments or discussions." [Doc. 77 at 5]. Defendants argue, therefore, that the statements constitute inadmissible hearsay.[2] [*Id.*].

Specifically, with respect to paragraph thirteen, Defendants contend that Trujillo's assertion that "[o]n August 25, 2011, Regional Forester, Corbin Newman, met with Commissioner Rardin and other Otero County officials" and following that meeting, "[Newman] relayed to [Trujillo] that it was Otero County's stated intention to develop and implement a plan to treat National Forest System lands in Otero County," [Doc. 71-1 at 4, ¶ 13], is hearsay. The United States correctly notes that statements made by county officials are not hearsay if they were "made by a person whom the party authorized to make a statement on the subject," or "by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(C), (D). The first layer out-of-court statement from "County officials" to Newman falls within this party-opponent exclusion and therefore does not constitute hearsay. Furthermore, although the second-layer statement from Newman to Trujillo is not shielded by the party-opponent exclusion (because Newman does not constitute a party-opponent within the meaning of the Rule), the statement nonetheless is admissible for summary judgment purposes

---

[2]  Although Defendants attack the admissibility of Trujillo's statements on hearsay grounds, they identify only paragraphs 13 and 54 specifically. The Court therefore considers only whether these paragraphs contain inadmissible hearsay.

even if it is offered to prove the truth of the matter asserted therein (*i.e.*, that the county intended to implement treatments on NFS lands).  The United States need not present summary judgment evidence in a form that would be admissible at trial provided that the content of the evidence would be admissible at trial.  *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005); *accord Weinbaum v. Las Cruces Pub. Schs.*, 465 F. Supp. 2d 1116, 1130 n.16 (D.N.M. 2006) (citation omitted).  Because the Court already has held that the content of the first-layer statement from "County officials" to Newman would be admissible at trial, the Court concludes that the second-layer statement is admissible for summary judgment purposes even though the vehicle by which the content is delivered—*i.e.*, a statement from Newman to Trujillo—would not be admissible at trial.  *See Bryant*, 432 F.3d at 1122 (explaining that a witness to a car accident could not submit his testimony at trial via affidavit because that statement would be hearsay, but that at the summary judgment stage, the affidavit is proper because its content—the eyewitness account of the affiant—is admissible); *see also Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1082 n.5 (10th Cir. 1999) (explaining that, although a "fair amount of inadmissible hearsay evidence" was introduced to support a party's motion for summary judgment, "the nonmoving party need not produce evidence in a form that would be admissible at trial" provided that "the content or substance of the evidence [is] admissible") (internal quotation marks and citation omitted).  The content of Newman's testimony is admissible pursuant to the party-opponent exception, and the United States, at trial, easily could eliminate the second layer of hearsay by calling Newman to testify directly to the comments "County officials" made to him.  *Cf. Weinbaum*, 465 F. Supp. 2d at 1130 n.16 (considering a plaintiff's exhibit that would otherwise be inadmissible at trial for summary judgment purposes in part because the plaintiff "could likely authenticate the letter in short order" at trial).

14

With respect to paragraph 54, in which Trujillo asserts that "Patrol Captain Tim Bertrand informed me that he had been informed by Sheriff Benny House that Sheriff House . . . would arrest Forest Service law enforcement officers on kidnapping charges if those officers arrested anyone implementing Otero County's Project," [Doc. 71-1 at 13, ¶ 54], the Court holds that because Bertram and House are party-opponents, their statements do not constitute hearsay.   *See* Fed. R. Evid. 801(d)(2).   The Court also holds that the statements do not constitute hearsay to the extent that they are offered not to prove the truth of the matter asserted—*i.e.*, that House would, in fact, arrest federal officials—but rather for some other purpose—*e.g.*, the effect of the statements on those hearing it.   Defendant's objections are overruled.

B.   The United States has Satisfied its Burden of Establishing that It Suffered a Threatened Injury in Fact.

The Court next determines whether the United States has satisfied its Article III burden of demonstrating it suffered a threatened injury in fact.   In *Clapper v. Amnesty International USA*, the United States Supreme Court discussed the first element of standing.   *See* 133 S. Ct. 1138, 1147 (2013).   The Court explained that "'[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.'"   *Id.* (quoting *Lujan*, 504 U.S. at 565, n.2).   "Thus, [the Court explained it has] repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."   *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (additional citation omitted); *see also Lujan*, 504 U.S. at 565, n.2.

Defendants Otero County and the State of New Mexico argue that the United States has not identified facts sufficient to establish that the threatened injury—*i.e.*, Otero County's unauthorized

implementation of the Garrett Plan or any other unauthorized treatments on NFS lands—was "certainly impending" on February 7, 2012, which is the date on which the United States filed suit and which, therefore, is the date on which the Court assesses standing. *See Gandy*, 416 F.3d at 1154 (explaining that standing is determined as of the time the action is brought). The County contends that its declarant Rardin confirmed that the county would implement the Garrett Plan without the Forest Service's consent only if consultation with the Forest Service fails, and the county argues that because "at this time, no official has entered onto forest land and taken any action in furtherance of Section 4-36-11 without necessary authority and approvals," the United States cannot establish that the threatened injury of unauthorized treatment of federal lands was certainly impending. [Doc. 77 at 2]. New Mexico similarly argues that the United States has failed to establish certainly impending injury because the evidence indicates that only if cooperative solutions fail and the Forest Service withholds its consent, will Otero County take action without the Forest Service's consent. [Doc. 72 at 2]. The State of New Mexico further contends that the United States cannot establish threatened injury in fact because the particular actions Otero County will take are "unknown and unspecified." [*Id.*].

The Court rejects Defendants' arguments and instead holds that the United States has presented evidence which, if true, establishes that threatened injury was certainly impending at the time it filed suit. It is not determinative, as the County and New Mexico assert, that no county official has as of yet entered NFS lands without consent, for the United States correctly asserts that it need not "wait for the County to actually trespass and cause the United States irreparable injury by cutting trees without authority from the Forest Service." [Doc. 92 at 9]. The relevant question is whether, on the United States' facts, the threatened injury is "certainly impending." The United States has pointed to evidence that satisfies this standard.

16

The evidence relevant to the Court's standing inquiry establishes that between the time when the county passed the Resolution in May 2011, and the date of filing of this suit, Otero County repeatedly indicated that it will implement the Garrett Plan without regard for whether it obtains the Forest Service's consent.   Specifically, county officials announced the County's intention to cut trees on NFS lands and repeatedly asserted in May and July 2011 that the County did not need, and would not wait for, Forest Service approval to treat NFS lands.   [Doc. 71-1 at 3, ¶¶ 6, 7].   Commissioner Rardin threatened in July 2011 that the sheriff would arrest federal employees if they interfered with the County's treatments on NFS lands.   [*Id.* at 3-4, ¶ 10].[3] County officials informed Forest Service representatives in August 2011 that the County "intended to move forward" with its plans and "would not wait for" Forest Service approval.   [*Id.* at 4, ¶¶ 11, 13].   County officials informed Trujillo on September 2, 2011, that they were going to hold a "kick off" "emergency tree cutting" event on September 17, 2011, to "*start* implementation*" of the Otero County project to treat NFS lands, [*id.* at 5, ¶ 17 (emphasis added)], and county officials held a meeting on September 8, 2011, to inform the public and garner support for the implementation of the Garett Plan, [*id.* at 7, ¶ 23].   At this meeting, the County "made clear" that it "would proceed" with its kick-off event without Forest Service approval.   [*Id.* at 6, ¶ 20].   As promised, Otero County held its event marking the "start" of its treatment of NFS lands on September 17, 2011, [Doc. 71 at 7, ¶ 6; Doc. 71-1 at 5, ¶ 17], and at that event confirmed in speeches that it would be implementing further treatments on NFS lands, [Doc. 71 at 8, ¶ 7].   The County indicated again in October 2011 that it was "unwilling to wait for Forest Service approval

---

[3]   [*See also* Doc. 71-1 at 13, ¶ 54 ("Sheriff House . . . has stated that he would arrest Forest service law enforcement officers on kidnapping charges if those officers arrested anyone implementing Otero County's project."); *id.* ("These statements are consistent with Commissioner Rardin's statements to me that Sheriff House would arrest any federal officials interfering with Otero County in its implementation of its plan to treat the Lincoln National Forest.")].

of [its] proposed project," [Doc. 71-1 at 12, ¶¶ 49-50], and submitted a new proposal in November 2011 calling for treatments, even if unauthorized, on 1,200 to 1,500 acres of NFS lands to be completed by the Spring of 2012.   [*Id.* at 12-13, ¶ 51].

The evidence also establishes that, although the Forrest Service was able to consent to the kick-off event because its scope impacted only one acre of NFS lands and fell within a previously-approved project, [*id.* at 6, ¶ 20], the Forest Service cannot and will not approve the broader Garrett Plan because it impacts 69,000 acres of federal land and is inconsistent with and violates federal law.   "Implementation of [the Garrett Plan] without a permit would effectively deprive the Forest Service of the Agency's ability and duty to comply with numerous Federal laws and regulations, including NEPA, Endangered Species Act, NFMA, and the Clean Water Act (CWA)."   [*Id.* at 8, ¶ 30].   In addition, because the Garrett Plan is aimed only at reducing the risk of wildfire, it interferes with the multi-faceted goals of the Forest Service's plans which seek to preserve the national forests for their many uses.   [*Id.* at 9, ¶¶ 33, 34].

The evidence demonstrates that for seven unwavering months the County repeatedly and publicly confirmed its unequivocal intention to implement the Garrett Plan without regard for whether the Forest Service consented to the plan.   That the County held a meeting on September 8, 2011, to inform the public about the Garrett Plan and to garner support for that plan, and that county representatives gave speeches at the kick-off event on September 17, 2011, in which the County confirmed publically its intent to implement the Garrett Plan, serves as further evidence that the county intended to treat federal lands even if without consent.[4]   This evidence, in

---

[4]   The Court notes that Defendants have not identified any contrary evidence suggesting that Otero County will not implement the Garrett Plan if the Forest Service withholds its consent. Although this absence of evidence is not relevant for standing purposes at the summary judgment stage because the Court assumes the truth of the United States' facts, *see Lujan*, 504 U.S. at 561, it

conjunction with the evidence that the Forest Service will not approve the Garrett Plan because, among other reasons, the plan violates federal law and conflicts with federal goals of preserving the national forests for their many uses, all of which the Court must assume is true for purposes of its standing inquiry, *see Lujan*, 504 U.S. at 561, establishes that the threatened injury of the county's treatment of NFS lands without authorization was impending on the date the United States filed suit.

It is not only the evidence that the county will cut trees on NFS lands without federal approval which establishes that the threatened harm was certainly impending on the date the United States filed suit but also the evidence that the county did, in fact, begin implementing the Garrett Plan on September 17, 2011, at its kick-off event.  Of particular import is that the undisputed evidence, which the Court must assume is true, *see id.*, establishes that the county would have held this kick-off event even if the Forest Service had withheld its approval.  [Doc. 71-1 at 6, ¶ 20].  On September 2, 2011, the county announced its intention to the Forest Service to hold the event to mark the "start" of the implementation of the county's treatments and indicated that it would do so without the Forest Service's consent, [*id.*], and, on September 17, 2011, only fifteen days thereafter, the county did in fact hold the event to mark the start of its treatments, [Doc. 71 at 7, ¶ 6].  This evidence is concrete and particularized and establishes that the county was willing to act, and to act in short order, to treat federal land without the Forest Service's consent.

The Court is not persuaded by Defendants' arguments to the contrary.  Defendants claim, for example, throughout their summary judgment briefing, that no injury in fact has occurred

---

serves as further confirmation that the United States has suffered a threatened injury in fact.

because Otero County is prepared to "consult" with the Forest Service prior to cutting any trees on federal lands without authorization. This commitment to consultation, Defendants maintain, renders the threatened injury uncertain and therefore negates injury in fact. [Doc. 72 at 2 (arguing that "Otero County 'will continue to consult with [the United States Regional Forester] and attempt to find cooperative solutions,'" that only if such cooperation fails will Otero County "'take physical action with or without the consent of the Forest Service,'" and that "[c]ritically, Otero County's plans to take action on federal land are contingent upon the failure of future negotiations with the Forrest Service") (quoting Doc. 64-1 at 2, ¶ 6)].

Defendants' argument is disingenuous. Although the Forest Service may have found a lawful way in which to approve the kick-off event on one acre of Forest Service land, the evidence before the Court on summary judgment establishes that the Forest Service will not be able to approve the broader implementation of the Garrett Plan on 69,000 acres of federal land. [Doc. 71-1 at 6, ¶ 20]. Thus, on the evidence before the Court, injury in fact is inevitable, for, when the United States withholds its consent, no amount of consultation between Otero County and the Forest Service will prevent the United States from suffering the certainly impending harm of the unauthorized treatment of federal lands by Otero County. For purposes of assessing standing, the Court must assume that the United States' evidence is true. *See Lujan*, 504 U.S. at 561. The proffered evidence is sufficient to satisfy the United States' burden of establishing certainly impending threatened harm.[5]

---

[5] That the "consultation" process may have resulted in the county offering new proposals for treatments of federal lands does not change the inevitability of injury. Defendants argue that their commitment to consultation is evidenced by the fact that the county's proposals continued to change as the county discussed proposals with the Forest Service. [Doc. 78 at 5-6 (citing Doc. 71-1 ¶¶ 50-52)]. Even if the Court were to construe the evidence as establishing that the county offered the Forest Service new treatment proposals, and even if the Court were to conclude that

At bottom, the county's offer of consultation with the Forest Service is pro forma, for the County has acknowledged that if the Forest Service withholds its consent the County will nonetheless act. Thus, Defendants in essence argue that the United States lacks standing to challenge the threat of Otero County's unauthorized treatment of federal lands because no unauthorized treatment of federal lands will occur if the Forest Service simply approves the county's plans. Or, stated starkly, the United States will not be injured if the Forest Service surrenders its authority and abdicates its duty to protect federal lands and to comply with federal law and instead does exactly what the County wants. For obvious reasons, the Court declines to so hold.

The Court likewise is not persuaded by Defendants' argument that the harm is not imminent because, as of yet, the county has taken no unauthorized action on federal land and that the kick-off event was conducted with the Forest Service's consent. That the County conducted the kick-off event with the Forest Service's approval does not alter the fact that the County would have held the event without the Forest Service's consent. While the County attempts to draw attention away from this latter fact by emphasizing the former and by describing the process leading up to the kick-off as "collaborative," [Doc. 78 at 8 (characterizing the kick-off event as "the sort of collaborative exercise that both federal law and Section 4-36-11 contemplate" and arguing that this type of "collaborative" event "cannot support standing")], the Forest Service's consent and the asserted "collaborative" process is of little import because the evidence establishes that the consent and process were undertaken under pressure.   [Doc. 71-1 at 6, ¶ 20].

these new proposals arose out of "consultation" with the Forest Service, the consultation—even if accompanied by a shift in the county's position—is without import. While the county may choose, through consultation, to offer interim proposal after proposal, the evidence confirms that at some point, when the Forest Service continues to withhold its consent, the county will end consultation and act without Forest Service approval.

It was Otero County's threats of implementing the Garrett Plan without Forest Service authorization that "compelled" the Forest Service to authorize the kick-off event because the Forest Service did not want to "put[ federal] employees at risk from the county's actions and from confrontations with the County Sheriff."   [*Id.*].   The Forest Service was forced "to diffuse a potentially tense and dangerous law enforcement situation by exploring potential locations and projects where all regulatory and policy requirements had been met."   [*Id.*].   To this end, the Forest Service identified the Sleepy Grass Campground Site, which consisted of less than one acre of land, as a potential site for the kick-off event, because the Forest Service had previously marked trees to be cut at this site in compliance with federal law but had not implemented this part of the project.   [*Id.* at 6, ¶ 21].   Although the implementation of the broader Otero County project outlined in the Garrett Plan would be inconsistent with and violate federal law, regulation, and policy, cutting trees on the one acre piece of land at the Sleepy Grass Campground Site would not violate federal law.   [*Id.* at 6, ¶ 20].

The Court declines to hold that the Forest Service's acquiescence for the kick-off event immunizes the County from a finding of imminence.   That the Forest Service knew the County would have held the event even if the Forest Service withheld its approval placed the Forest Service in the untenable position of choosing between, on the one hand, a potentially dangerous confrontation in the field that would compromise federal employees and others by, among other things, placing them at risk of arrest, and, on the other hand, the authorization of a small event on one acre of land (in contrast to the 69,000 acres of land proposed for treatment in the Garrett Plan that could not be executed in compliance with federal law) that already had been approved and would be executed in compliance with federal law.   That the Forest Service chose the latter option, under these facts, does not negate imminence or alter the fact that the County was prepared

to hold a public event on federal land without the required federal approval.   It is the evidence that the County would have acted without federal approval that is determinative, and not that the Forest Service obviated the County's need to act without approval by providing its consent.   To hold otherwise would penalize the United States for its decision to seek controlled redress through the courts instead of unpredictable and potentially dangerous confrontation in the field.   The Court declines to inflict such a penalty.

For the foregoing reasons, the Court concludes that the United States has satisfied its burden of establishing that that it suffered a threatened injury in fact as of the date on which it filed suit.   Because it is only the first element of standing that was in question, the Court concludes that the United States has standing to pursue its claims.

II.     The United States' Claims are Ripe for Adjudication.

Defendant Otero County suggests that the United States' claims may not be ripe for a judicial challenge, [Doc. 77 at 5], as required by Article III.   S*ee New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).[6]   While the "[s]tanding doctrine is designed to determine *who* may institute the asserted claim for relief," the "[r]ipeness doctrine addresses a *timing* question:   *when* in time is it appropriate for a court to take up the asserted claim."   *ACORN v. City of Tulsa*, 835 F.2d 735, 738 (10th Cir. 1987) (citation and internal quotation marks omitted).

Generally, a district court applies "a two-factor test to determine whether an issue is ripe," evaluating "'the fitness of the issue for judicial resolution and the hardship to the parties of

---

[6]   Ripeness is a second doctrine that, like standing, distinguishes the "Cases" and "Controversies" that are of the justiciable sort referred to in Article III.   "In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy."   *New Mexicans for Bill Richardson*, 64 F.3d at 1499.

withholding judicial consideration." *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 2008) (quoting *Sierra Club v. Yeutter*, 911 F.2d 1405, 1415 (10th Cir. 1990)) (citation omitted). Here, however, the Court need not apply that test, for our Tenth Circuit has held, that if "'a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.'" *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999) (quoting *Nat'l Treasury Emp. Union v. U.S.*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)); *accord Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (citation omitted). The Court previously held that the United States satisfied its burden of establishing imminence for the purposes of demonstrating threatened injury in fact. Having so held, the Court necessarily must hold that the United States also has satisfied the ripeness requirement of Article III. *Cf. Johnson, 194 F.3rd at 1155.* Thus, the Court rejects Otero County's contention that the United States' claims may not be ripe for adjudication.

III.   The Court Denies Pacific Legal Foundation's Motion for Leave to File Brief Amicus Curiae.

"'Historically, *amicus curiae* is an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another.'" *WildEarth Guardians v. Lane*, No. 12-CV-0118 LFG/KBM, 2012 WL 10028647, *2 (D.N.M. June 20, 2012) (quoting *Community Ass'n for Restoration of Environment v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999)). "There is no precedent directly on point in the Tenth Circuit Court of Appeals[] . . . in deciding whether to allow or deny *amicus* participation. Nor is there a pertinent rule of civil procedure" governing amicus participation in federal district courts. *Id.* (citation omitted). Although no Federal Rule of Civil Procedure

24

governs amicus participation in a district court case, district courts commonly look for guidance to Federal Rule of Appellate Procedure 29, which governs amicus curiae briefs in the United States Circuit Courts of Appeal.[7]   Under Appellate Rule 29(b), a motion seeking leave to participate as amicus must, among other requirements, state why the matters asserted are relevant to the disposition of the case.   *See* Fed. R. App. P. 29(b)(1), (2).   Furthermore, in determining whether to accept an amicus brief, courts consider, among other things, (1) "whether the proposed *amicus* is a disinterested entity"; (2) "whether there is opposition to the entry of the *amicus*"; (3) "whether counsel is capable of making arguments without the assistance of an *amicus*"; (4) "the strength of the information and argument presented by the potential *amicus curiae's* interests"; and (5) "perhaps most importantly," "the usefulness of information and argument presented by the potential *amicus curiae* to the court."   *Ass'n of Am. Sch. Paper Suppliers v. U.S.*, 683 F. Supp. 2d 1326, 1328 (Ct. Int'l Trade 2010) (citations omitted).   A district court exercises wide discretion in deciding whether to grant or deny leave to file an amicus brief.   *See WildEarth Guardians*, 2012 WL 10028647, at *1 (citations omitted).

The Court concludes that PLF has not presented information in its brief that will be of assistance to the Court because its proposed brief injects a new issue into this case not raised by the parties and because it contains no arguments that are relevant to the disposition of the claims before the Court on summary judgment.   In its complaint, it asserts two counts.   [Doc. 1].   In the

---

[7]   *See, e.g.*, *Sierra Club v. FEMA*, No. H-07-0608, 2007 WL 3472851, at *1 (S.D. Tex. Nov. 14, 2007) ("District courts commonly seek guidance from Federal Rule of Appellate Procedure 29."); *U.S. v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002) ("Although there is no rule governing the appearance of an *amicus curiae* in the United States District Courts, the Third Circuit's application of Fed. R. App. P. 29, . . . provides guidance to this Court.") (internal footnotes omitted); *Martinez v. Cap. Cities/ABC-WPVI*, 909 F. Supp. 283, 286 (E.D. Pa. 1995) ("Although a district court has inherent power to appoint *amici*, there is no specific statute or rule that so provides, and [this court] therefore [is] guided by Rule 29 of the Federal Rules of Appellate Procedure.").

first count, the United States seeks a declaration that Section 4-36-11 is in conflict with and interferes with federal law, that Section 4-36-11 violates the Supremacy Clause of the United States Constitution, and that Section 4-36-11 therefore is preempted by federal law and is unconstitutional.  [*Id.* ¶ 55].  In the second count, it seeks a declaration that the Otero County Resolution is in conflict with and interferes with federal law, that the Otero County Resolution violates the Supremacy Clause, and that the Otero County Resolution therefore is preempted by federal law and is unconstitutional.  [*Id.* ¶ 61].  In their Answers, neither defendant raises any counterclaims against the United States or the Forest Service.[8]   [Docs. 9, 17].

PLF's brief does not address either of the two claims pending before this Court.  Rather, while recognizing in the only paragraph comprising the introduction to its proposed brief that the primary issue in the case is "[w]hether the County may directly abate public nuisance conditions . . . in the Lincoln National Forest under the authority of a local ordinance adopted pursuant to a New Mexico Statute," PFL asserts in the very next sentence that "[t]his amicus curiae brief addresses the legal question of whether Otero County can hold a federal agency, such as the USDA Forest Service, liable for maintaining a public nuisance in the first instance.  The answer to that question is yes."  [Doc. 86 at 1].  PLF thereafter asserts in the third and last sentence of its introductory paragraph that it "urges the Court to rule to that effect, and that such public nuisances are subject to abatement, *regardless* of its ruling on whether a local ordinance is a legally

---

[8]   Although Otero County's Answer states in its title that it includes a counterclaim for nuisance, the answer itself contains no counterclaim and it requests no relief from the Court regarding a counterclaim.  Moreover, in the Joint Status Report and Provisional Discovery Plan, Otero County does not indicate that it brings any counterclaim against the United States and instead indicates that its contentions relate only to whether the New Mexico statute and its county Resolution are valid and constitutional pursuant to the Tenth Amendment and whether its actions are preempted by federal law.  [Doc. 56 at 5].

permissible means of abating a public nuisance maintained by a federal agency."   [*Id.* (emphasis

added)].   Thus, in the introductory paragraph of its proposed brief, PLF admits that it does not

address the issue it acknowledges is before the Court in this case—namely, whether the United

States is entitled to a declaration that the New Mexico statute and Otero County Resolution are

unconstitutional—but rather that it seeks to determine "in the first instance" whether Otero County

can hold the United States Forest Service liable for maintaining a public nuisance.   [*Id.*].   That

PLF asks the Court to address this latter question "regardless" of its ruling on the issues actually

before the court, [*id.*], confirms that the question addressed in PLF's proposed brief is separate and

distinct from the question at issue in this litigation and can be decided wholly independent, or

"regardless," of this Court's decision on the United States' claims.

A review of the remainder of PLF's proposed brief confirms that the brief contains new

arguments on a new claim that are not relevant to the claims or arguments before this Court.   The

proposed brief discusses only whether Otero County can hold the Forest Service liable for

maintaining a public nuisance.   First, PLF argues that a party may bring a claim for public

nuisance against federal agencies under federal common law.   [Doc. 86 at 2-5.]   Then, it argues

that fire danger is a public nuisance that would support a claim against the Forest Service, [*id.* at

5-8], that the nuisance the Forest Service is maintaining is of the type which this Court can order

the Forest Service to abate, [*id.* at 8], that the federal common law claim has not been displaced by

any federal legislation thereby absolving the Forest Service of liability, and that the only

"contender" for a federal statute that might displace the common law falls short of the criteria for

displacement, [*id.* at 9-12].   In its concluding paragraph, PLF asserts that "[t]he Forest Service is

subject to suit brought by a state or subdivision . . . , under the federal common law, for

maintaining a public nuisance . . . on its property," that "[n]o federal statute displaces this claim,"

and therefore that "the Court should hold that the Forest Service can be held liable for maintaining this public nuisance, and that this condition is subject to abatement."   [*Id.* at 13].

Thus, the entirety of PLF's proposed amicus brief addresses a topic not presently before this Court.   While "Otero County has variously argued that its actions do not offend the Property Clause and the Supremacy Clause because the County can exercise its 'police power' under the Tenth Amendment to *itself* abate an alleged nuisance on the Lincoln National Forest pursuant to the authority of the New Mexico Statute and County Resolution," [Doc. 94 at 8 (citing Doc. 64 at 6-15)], "neither Otero County nor the State has raised a counterclaim requesting—as Pacific Legal Foundation does in its proposed *amicus* brief—the Court to order the Forest Service to abate the alleged nuisance," [*id.*].

The Court therefore denies PLF's Motion for Leave to File Brief Amicus Curiae because PLF's proposed brief injects a new legal question into this case and does not contain arguments that relate to any pending claims in this case.   Regarding the first point, "[A]n *amicus curiae* is not a party and has no control over the litigation and no right to institute any proceedings in it[;] nor can it file any pleadings or motions in the case."   *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1068 (N.D. Cal. 2005) (citation omitted), *rev'd in part on other grounds by Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767 (9th Cir. 2008). Moreover, "'[t]he named parties should always remain in control, with the *amicus* merely responding to the issues presented by the parties.'"   *Alkaabi*, 223 F. Supp. 2d at 593 n.19 (quoting *Waste Mgmt., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995)).   "'An *amicus* cannot initiate, create, extend, or enlarge issues.'"   *Id.* (quoting *Waste Mgmt.*, 162 F.R.D. at 36). Consistent with this limited role, an amicus may not introduce an issue into a case or seek relief that is not raised or requested by the parties.   *See, e.g.*, *Atlantic Richfield Co. v. Farm Credit Bank*

28

*of Wichita*, 226 F.3d 1138, 1145 n.2 (10th Cir. 2000) (striking arguments in amicus brief "that have never been advanced by the parties"); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 n.4 (1991) ("[W]e do not ordinarily address issues raised only by *amici*.") (citation omitted).

Regarding the second point, Appellate Rule 29 provides that a motion seeking leave to participate as amicus must, among other requirements, state why the matters asserted are relevant to the disposition of the case. *See* Fed. R. App. P. 29(b)(1), (2). The comments to Appellate Rule 29(b) note that "the relevance of the matters asserted by an amicus is ordinarily the most compelling reason for granting leave to file" an amicus brief. Fed. R. App. P. 29, cmt. to paragraph (b). Moreover, although courts consider a variety of factors in determining whether to accept an amicus brief, the "most important[]" factor is "the usefulness of information and argument presented by the potential *amicus curiae* to the court." *Ass'n of Am. Sch. Paper Suppliers*, 683 F. Supp. 2d at 1328 (citations omitted). Indeed, the Seventh Circuit has emphasized that, except when a party is not represented competently or at all, or when an amicus has an interest in some other case that might be affected by the present case, leave to file an amicus curiae brief should be denied unless "the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Ryan v. Commodity Futures Trading Comm.*, 125 F.3d 1062, 1063 (7th Cir. 1997) (citation omitted).

PLF both injects a new issue into this case and fails to articulate why the arguments asserted in its proposed brief are relevant to the disposition of this case. As previously discussed, this Court's review of PLF's proposed brief reveals that it addresses only a new claim and that it contains no argument relevant to the disposition of this case. The Court denies PLF's Motion for

Leave to File Brief Amicus Curiae.[9]

IV.     The Court Grants the United States Summary Judgment on its Claims against Otero County and Denies Otero County Summary Judgment on the United States' Claims.

Having held that the United States has standing to bring its claims and that the claims are ripe for adjudication, the Court now addresses the merits of the arguments raised in support of the United States' and Otero County's cross-motions for summary judgment.   A movant is entitled to summary judgment if the documents in the record do not establish a genuine dispute of material fact and "the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56 (a), (c). The parties agree that there are no facts in dispute regarding the merits of the motions and that the questions before the Court on summary judgment are purely legal.   [Doc. 64 at 4; Doc. 71 at 4; Doc. 78 at 2 n.1].   Thus, the legal questions governing the dispute between them are appropriate for summary adjudication.

The United States seeks summary judgment on its claim against Otero County, asking the Court to declare that the county Resolution in conflict with federal law, that the Resolution violates the Supremacy Clause, and that the Resolution therefore is unconstitutional and must be invalidated.   [Doc. 1 ¶ 61].   Otero County cross-moves for summary judgment on the United States' claim, arguing that the Court should declare the New Mexico statute and the Otero County Resolution constitutional because they merely delegate to the State of New Mexico and the counties the inherent police powers over federal lands that the Constitution already reserves to the states under the Tenth Amendment and therefore that, because the statute and Resolution are exercises of valid state police power over federal land, federal law does not supersede the state law

---

[9]   Because the Court denies PLF's motion on the foregoing grounds, and this holding is dispositive, the Court does not consider the remaining arguments of the United States in opposition to PLF's motion.

or county Resolution.   [Doc. 64 at 5, 7-8].   In the alternative, Otero County contends that, even if the Tenth Amendment does not reserve for it the exclusive power to regulate federal lands, it nonetheless is entitled to summary judgment because New Mexico and the county exercise concurrent jurisdiction over federal lands and the state law and county Resolution do not conflict with federal law, do not violate the Supremacy Clause, are not preempted by federal law, and therefore should not be invalidated by this Court.   [*Id.* at 12-13].

The Court first determines whether the Property Clause to the United States Constitution grants plenary power over federal lands to Congress or whether the Tenth Amendment reserves to the states a power to "abate a disaster/threat/nuisance to the health, safety and welfare of [their] citizens," [*id.* at 5], on federal lands within their borders.   Because the Court concludes that the Property Clause grants Congress plenary power over federal lands and that the Tenth Amendment therefore necessarily does not reserve the power to abate a nuisance or threat on federal lands to New Mexico or the other states, the Court next determines whether Section 4-36-11 of the New Mexico statute and the Otero County Resolution represent a constitutional exercise of the state's and county's concurrent jurisdiction over federal land, or whether, the statute and Resolution conflict with federal law in violation of the Supremacy Clause and must be invalidated.

A.   The Property Clause Grants Congress Plenary Power Over Federal Lands and the Tenth Amendment does not Reserve for New Mexico or its Counties an Exclusive Police Power over Federal Lands.

The United States' Motion for Summary Judgment, which in part seeks a declaration from this Court that the New Mexico statute and Otero County Resolution are in conflict with, and therefore superseded by, federal law pursuant to the Supremacy Clause of the Constitution, necessarily assumes that the Property Clause of the Constitution grants Congress plenary power

over federal lands and that the Tenth Amendment, therefore, does not reserve for the states any exclusive police power to abate a nuisance or threat on federal lands.   In contrast, Otero County argues, in support of its motion for summary judgment, that the New Mexico statute and Otero County Resolution are constitutional because the Tenth Amendment reserves for the state and county certain inherent police powers to abate a nuisance or threat on federal lands and to protect the health, safety, and welfare of New Mexico citizens on federal lands and because the Property Clause does not grant Congress the power to regulate federal lands when the regulation impedes New Mexico's sovereign police powers to protect its citizens on federal lands.   [*Id.* at 7-8].   In Otero County's view, by enforcing the federal statutes and regulations upon which the Forest Service relies, the Forest Service "is attempting to anticipatorily interfere with the lawful exercise of New Mexico's police powers" and "is thereby depriving the State of its structural autonomy." [*Id.* at 9].   Otero County concludes that the United States "has successfully located an outer boundary of the rights bestowed upon [it] by the Property Clause by filing this anticipatory action, and is now attempting to exceed that authority in violation of the State of New Mexico's police power reserved to it by the Tenth Amendment which has been properly delegated to the counties." [*Id.* at 15].

To resolve this dispute of law between the United States and Otero County, the Court must examine the line between the powers delegated to the United States by the Constitution and those reserved to the states.   "The Constitution created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).   The Supreme Court has noted that, "while the Tenth Amendment makes explicit that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people[,]' the task of ascertaining the constitutional line between federal and state power has given

rise to many of the Court's most difficult and celebrated cases." *New York v. U.S.*, 505 U.S. 144, 155 (1992) (quoting U.S. Const. amend. X).

Our Tenth Circuit's decision in *Wyoming v. United States*, 279 F.3d 1214 (10th Cir. 2002), is controlling. In *Wyoming*, the state brought suit against the federal government, challenging the refusal of United States Fish and Wildlife Service ("FWS") to permit the state to vaccinate elk on the National Elk Range ("NER") with a vaccine for brucellosis, which is a serious disease that causes miscarriage, is endemic to free-ranging elk in the greater Yellowstone area, and is a threat to Wyoming's domestic cattle industry. *Id.* at 1218. The suit generally alleged the FWS's refusal to permit the state to vaccinate constituted unlawful interference with the state's "sovereign right" to manage wildlife within its borders, including its right to vaccinate elk on the NER. *Id.* at 1222. Specifically, the state alleged in a count labeled "Tenth Amendment Infringement," that the Tenth Amendment reserved for it the it "'inherent sovereign authority [within its borders] to manage, control, and regulate diseases in wildlife and domestic animals for the health, safety and protection of its citizens, its domesticated livestock and its free roaming wildlife.'" *Id.* at 1223 (quoting the state's complaint). The district court dismissed this count on the merits, holding that that "the State of Wyoming 'does not have the sovereign power to manage wildlife on Federal lands,'" reasoning that "managing wildlife on federal land was not a power reserved to the States under the Tenth Amendment," and explaining that "the Federal Government took that power under the auspices of the Constitution's Property Clause." *Id.* at 1223 (quoting *Wyoming v. U.S.*, 61 F. Supp. 2d 1209, 1216-17 (D. Wyo. 1999)). On appeal, "[t]he State assert[ed] a concurrent, if not exclusive, right to manage wildlife on the NER, including a right to vaccinate elk on the NER . . . , free from federal interference," and "[t]he FWS counter[ed] by asserting exclusive unlimited discretion under the NWRSIA to manage wildlife on the NER in any manner the Secretary deems

appropriate, free from state interference." *Id.* at 1224.

The Tenth Circuit rejected Wyoming's argument that the Tenth Amendment reserved for the state the power to manage wildlife and vaccinate elk on federally-owned lands. *See id.* at 1227. The *Wyoming* court explained that while "[h]istorically, States have possessed 'broad trustee and police powers over the . . . wildlife within their borders, including . . . wildlife found on Federal lands within a State,'" *id.* at 1226 (quoting 43 C.F.R. § 24.3) (additional citation omitted), "those powers are not constitutionally-based," *id.* To the contrary, the Tenth Circuit held that "[t]he Property Clause of the United States Constitution delegates to *Congress* (thus the Tenth Amendment does not reserve to the States) 'the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.'" *Id.* at 1226 (quoting U.S. Const. art. IV, § 3, cl. 2) (emphasis added). The *Wyoming* court further explained that "Congress' power [to regulate the United States' lands] is 'plenary,'" *id.* at 1227, and therefore that, although states share concurrent jurisdiction, this "State jurisdiction over federal land 'does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use and to prescribe in what manner others may acquire rights in them,'" *id.* (quoting *Utah Power and Light Co. v. Unites States*, 243 U.S. 389, 404 (1917)). Therefore, the Tenth Circuit concluded that "[i]f Congress so chooses, federal legislation, together with the policies and objectives encompassed therein, necessarily override and preempt conflicting state laws, policies, and objectives under the Constitution's Supremacy Clause." *Id.* (citing U.S. Const. art. VI, cl. 2; *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976)). In view of these principles, the *Wyoming* court held that it is "painfully apparent" that, contrary to the state's contention on appeal, "the Tenth Amendment does not reserve to . . . Wyoming the right to manage wildlife, or more specifically vaccinate elk, on the NER, regardless of the

circumstances." *Id.*

*Wyoming* compels the Court to reject Otero County's contentions that the Tenth Amendment reserves for New Mexico the powers to abate a nuisance or threat on federal lands. The State of Wyoming advanced the same argument that Otero County raises before this Court: That the Tenth Amendment reserves for the states inherent sovereign authority to regulate land owned by the federal government, but within state borders, for the protection of the health, safety, and welfare of the states' citizens. The Tenth Circuit flatly rejected this argument, labeling it "painfully apparent" that the Tenth Amendment does not reserve for the states any sovereign police power to regulate federal lands, or, stating this proposition in its mirror image, that the Property Clause clearly delegates this power to the federal government and therefore withholds it from the states. *See id.* The *Wyoming* court's conclusion and its reasoning apply equally here.

Consistent with the Supreme Court's holdings and our Tenth Circuit's decision in *Wyoming*, the Court rejects Otero County's contention that the Tenth Amendment reserves for it a sovereign right to abate a nuisance or threat on federal lands or to regulate and legislate for the protection of the health, safety, and welfare of New Mexico citizens on federal lands within New Mexico's borders. The Court necessarily also rejects Otero County's contention that the United States has exceed the scope of its power under the Property Clause.

A.     The New Mexico Statute and Otero County Resolution are Unconstitutional Because they Conflict with Federal Law and Therefore Violate the Supremacy Clause of the United States Constitution.

Having held that the Constitution grants Congress a complete and plenary power (and therefore does not reserve for the states a Tenth Amendment, constitutionally-based power) over federal lands, the Court next determines whether, as Otero County contends, the New Mexico statute and county Resolution constitute permissible exercises of state and local concurrent

jurisdiction over NFS lands, or whether, as the United States argues, the state and local laws conflict with federal law in violation of the Supremacy Clause.   It is well settled that states have concurrent jurisdiction over federal lands for many purposes.[10]   "[T]his jurisdiction[, however,] does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may require rights in them," *Utah Power*, 243 U.S. at 404, for, as the Court already has held, the Constitution grants Congress—and does not reserve for the states—plenary power over federal lands.

Thus, a state's right to exercise concurrent jurisdiction over federal lands is not derived from the Constitution or the Tenth Amendment, but rather is defined by Congress.   *See Wyoming*, 279 F.3d at 1226, 1227 (explaining that permission to exercise concurrent power over federal lands "must come, if at all, not from the Constitution but from Congress"); *Advanced Career Techs., Inc. v. John Does 1-10*, No. 13-CV-0304-WJM-KLM, 2015 WL 1884358, *2 (D. Colo. Apr. 24, 2015) ("preemption is fundamentally a question of congressional intent") (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990)).   Congress may choose, in enacting statutes pursuant to its Property Clause power, to allow states to share concurrent jurisdiction with the United States on federal lands within their borders.   *See Wyoming*, 279 F.3d at 1227 (explaining that, although the Tenth Amendment did not reserve the power of the states to regulate federal lands, the state nonetheless may be entitled to vaccinate elk on federal lands if Congress intended to grant the state that power).   Stated differently, the question of the validity of a state's law enacted pursuant to its concurrent jurisdiction is not a substantive constitutional question answered

---

[10]   *See, e.g.*, *Utah Power*, 243 U.S. at 404 (explaining that "for many purposes a state has civil and criminal jurisdiction over lands within its limits belonging to the United States"); *see also Wyoming*, 279 F.3d at 1226-27 (acknowledging "[o]f course, [that] the Property Clause alone does not withdraw federal land within a State from the jurisdiction of the State" and explaining that the state retains civil and criminal jurisdiction over federal lands).

by examining the affirmative provisions of the Constitution but rather is a statutory question determined by examining whether the state law conflicts with the federal congressional law at issue, such that the Supremacy Clause requires the state law to recede.  *See City of Hugo v. Nichols*, 656 F.3d 1251, 1256 (10th Cir. 2011) (explaining that the Supremacy Clause is "not a source of any federal rights" but rather operates to "secure federal rights by according them priority whenever they come in conflict with state law," and that "a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some *other* federal law, which trumps a contrary state law by operation of the Supremacy Clause") (internal quotations and citation omitted), *cert denied*, 132 S. Ct. 1744 (2012); *see also* U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

Thus, to determine whether a state or local exercise of police power is valid, or, in contrast, violates the Supremacy Clause, the Court must examine the federal law at issue and determine whether Congress intended to preempt state and local concurrent jurisdiction over federal lands. *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) ("It is, finally, axiomatic that 'for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.'") (quoting *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)) (additional citation omitted).   The Court's analysis "'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'"   *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230

(1947)); *accord Wyoming*, 239 F.3d at 1231. "'The purpose of Congress is the ultimate touchstone' of [the Court's] pre-emption analysis." *Cipollone*, 505 U.S. at 516 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497 (1978)).

"Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Id.* (quoting *Jones v. Roth Packing Co.*, 430 U.S. 519, 525 (1977)). Thus, while Congress may enact a statute that contains an express preemption provision, *see Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1977 (2011), preemption need not be express. State law also "is preempted if that law actually conflicts with federal law, or if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone*, 505 U.S. at 516 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982)) (additional citation omitted). The former type of preemption is referred to as "conflict preemption" while the latter is "field preemption." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). Regarding the former, state laws are preempted when they conflict with federal law, which "includes cases where 'compliance with both federal and state regulations is a physical impossibility,'" *Arizona v. U.S.*, 132 S. Ct. 2492, 2501 (2012) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)), "and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Regarding the latter, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* (citation omitted). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the

38

federal system will be assumed to preclude enforcement of state laws on the same subject.'"   *Id.* (quoting *Rice*, 331 U.S. at 230) (additional citation omitted).

The Court gleans no clear and manifest purpose of Congress to supersede in full the states' police powers on federally-owned lands or to prohibit all state regulation of federal lands.   *See Cipollone*, 505 U.S. at 516.   Even if, however, Congress has not preempted New Mexico's police power across the field, it is clear that New Mexico's jurisdiction on NFS lands does not extend to matters inconsistent with federal law.   *See Kleppe*, 426 U.S. at 543 (explaining that while a state "undoubtedly retains jurisdiction over federal lands within its territory," "Congress equally surely retains the power to enact legislation respecting those lands pursuant to the *Property Clause*," and that, where state laws conflict with federal laws enacted pursuant to the Property Clause, "the law is clear:   The state laws must recede") (citation omitted)).   Thus, the Court determines whether, as the United States contends, the state statute and county Resolution directly conflict with federal law either because compliance with both state and federal law is not possible or because the state and local laws frustrate Congress's objectives underlying federal law.

1.   <u>The New Mexico Statute and Otero County Resolution Conflict with Federal Regulations Requiring Forest Service Authorization Prior to Cutting or Removing Trees on NFS Lands.</u>

The United States contends that the New Mexico statute and Otero County Resolution directly conflict with regulations that the USDA promulgated pursuant to its mandate from Congress to protect the forests from fire and to regulate their occupancy and use.   The regulations upon which the United States relies to advance this Supremacy Clause argument[11] generally

---

[11]   Otero County concedes that "Courts have recognized that an agency regulation with the force of law can preempt conflicting state requirements."   [Doc. 77 at 12 (citations omitted)]; *see Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. at 707, 713 ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes.")

require any party wishing to use NFS lands first to obtain a "special use authorization" from the Forest Service.   *See* 36 C.F.R. § 251.50(a).   Although the regulations provide that those wishing to use the national forest to sell or dispose of timber are exempt from the required special use authorization,[12] they nonetheless require that such use of the national forest be pursuant to a timber sale contract awarded by the Forest Service.   *See id.* § 251.50(a).   In addition, the regulations prohibit the following activities on NFS lands:   (1) "[c]utting or otherwise damaging any timber, tree, or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," *id.* § 261.6(a); (2) "removing any timber, tree or other forest product except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," *id.* § 261.6(h); (3) "conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization," *id.* § 261.10(c); and (4) maintaining "significant surface disturbance . . . without a special-use authorization, contract, or approved operating plan when such authorization is required," *id.* § 261.10(a).   The regulations further prohibit "[u]se or occupancy of National Forest System land or facilities without special-use authorization when such authorization is required."   *Id.* § 261.10(k).   The regulations also prohibit "[d]amaging any natural feature or other property of the United States," *id.* § 261.9(a), and "[r]emoving any natural feature or other property of the United States," *id.* §

(citations omitted).

---

[12]   The regulations also except other uses of the national forests from the required special use authorization.   *See* 36 C.F.R. § 251.50(a), (c)-(e) (exempting from the required special use authorization uses involving sharing use of roads, grazing and livestock use, and mineral use as well as certain non-commercial use (*e.g.*, camping), use of NFS roads for travel, use with a nominal impact on NFS lands, use for routine maintenance on roads, canals, and ditches, and use regulated by a state or federal agency in a manner sufficient to protect NFS lands and avoid conflict with NFS programs).   These uses, however, are not relevant to the preemption dispute at issue, and the Court therefore does not discuss them herein.

261.9(b).   Finally, the regulations prohibit all uses of NFS lands that are not conducted pursuant to a special use authorization or a timber sale contract.   *See id.* § 251.50(a).

The United States contends that the New Mexico statute and Otero County Resolution violate, and therefore directly conflict with, these federal regulations.   The Court first examines whether the statute and Resolution violate the federal regulations and, because it answers this question in the affirmative, next considers whether the violations give rise to a direct conflict with federal law rendering the state statute and county Resolution preempted and invalid under the Supremacy Clause of the United States' Constitution.

Section 4-36-11(C) of the New Mexico statute authorizes the board of county commissioners of a county in which a disaster has been declared, after "consulting with the state forester and the regional United States forester," among other things, to "take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damages trees within the area of the disaster," N.M. Stat. Ann. § 4-36-11(C), and the statute does not require the county to obtain Forest Service authorization prior to taking the action or otherwise to ensure that the action is authorized by federal law.   To the contrary, Section 4-36-11(A) provides that the United States has "forfeit[ed]" its "jurisdictional supremacy" over NFS lands and that, because of this forfeiture, "a jurisdictional vacuum" has been created that "requires" New Mexico "to acknowledge its obligations as a sovereign power to protect the lives and property of its citizens and consequently to authorize any action it presently deems necessary to fill the vacuum created by the federal government by assuming jurisdiction to reduce to acceptable levels, if not remove, the threat of catastrophic fires posed by present conditions in national forests."   *Id.* § 4-36-11(A)(3)-(4).   The Otero County Resolution similarly provides that Otero County "formally notifies State and Federal officials that pursuant to NMSA 1978 § 4-36-11C, it is empowered to . . . take such actions

41

as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster," [Doc. 1-2 at 2], and the Resolution does not require the county to obtain Forest Service authorization prior to taking the actions authorized by the Resolution or to otherwise ensure that the actions are consistent with federal law.   The only relevant pre-condition contemplated by either the Resolution or New Mexico statute prior to authorizing or "empower[ing]" a county to act is "consulting with . . . the Regional United States Forester." [*Id.*]; *see also* N.M. Stat. Ann. § 4-36-11(C).   Thus, Section 4-36-11(C) of the New Mexico statute authorizes the board of county commissioners of a New Mexico county, and the Otero County Resolution empowers Otero County, to cut and remove trees from NFS lands without Forest Service authorization, whereas, in contrast, federal regulations expressly prohibit such unauthorized actions on NFS lands.

More specifically, the state and county actions of "clear[ing] and thin[ning] undergrowth" and "remov[ing] or log[ging] fire-damaged trees," which are authorized by the state regime, N.M. Stat. Ann. § 4-36-11(C); [Doc. 1-2 at 2], if undertaken by the county, directly violate Section 261.6(a) of the federal regulations, which prohibits "[c]utting or otherwise damaging any timber, tree, or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," 36 C.F.R. § 261.6(a).   This is because both the statute and Resolution authorize Otero County to take actions that are prohibited by Section 261.6(a) and do not require Otero County first to ensure that its actions fall within one of the enumerated exceptions set forth in Section 261.6(a).   Likewise, for the same reason, the actions authorized by the state statute and county Resolution, if undertaken by the county, violate Section 261.6(h) of the federal regulations prohibiting "[r]emoving any timber, tree or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," *id.* §

261.6(h), Section 261.10(c) prohibiting "conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization," *id.* § 261.10(c), and Section 261.10(k) prohibiting "[u]s[ing] or occup[ying]" NFS land without a special use authorization, *id.* § 261.10(k).   In addition, the actions authorized by the statute and Resolution, if undertaken by the county, violate Section 251.50(a) of the federal regulations, which provides that uses of the national forests must be conducted pursuant either to a special use authorization or to a timber sale contract, *see id.* § 251.50(a), because the New Mexico statute and county Resolution do not require the county to obtain either a special use authorization or a timber sale contract prior to acting.[13]

Otero County's arguments to the contrary are not compelling.   The Court is not persuaded by Otero County's contention that the state and federal regimes are in harmony because the actions contemplated by the state laws fall within the federal regulatory exception for actions "authorized by Federal law."   36 C.F.R. §§ 261.6(a), (h); *see also id.* §§ 261.10(c), (k).   Otero County reasons that, for example, "36 C.F.R. § 261.6(a) . . . only prohibits cutting or otherwise damaging any timber, tree, or other forest product in the absence of a 'special-use authorization, timber sale contract, or Federal law or regulation,'" and that "Section 261.6(h) reads similarly."   [Doc. 77 at 14 (citing 36 C.F.R. § 261.6(a)) (internal quotations omitted)].   The county then posits that its

---

[13]   The Court declines to consider whether, as the United States argues, the state and county's proposed actions violate the federal regulation prohibiting the maintenance of "significant surface disturbance . . .   without a special-use authorization, contract, or approved operating plan when such authorization is required," 36 C.F.R. § 261.10(a), or the federal law criminalizing the injury to or destruction of trees on lands owned by the federal government, *see* 18 U.S.C. § 1853 ("Whoever unlawfully cuts, or wantonly injures or destroys any tree growing, standing, or being upon any land of the United States which, in pursuance of law, has been reserved or purchased by the United States for any public use . . . *without the consent of the United States*, shall be fined under this title or imprisoned not more than one year, or both.") (emphasis added), because the Court concludes that the proposed actions violate other federal regulations and this conclusion is dispositive of the issues before the Court on summary judgment.

actions fall within the exception for actions authorized by federal law "[s]ince the police powers of the Tenth Amendment are applicable Federal law." [*Id.*]. The county asserts that, "[c]ontrary to the United States' assertions . . . , actual authorization of the Forest Service to perform acts provided for at 36 [C.F.R. §] 261.6(a) is not required, if federal law authorizes the activity," and that "[t]here is consequently no conflict." [*Id.*].

The flaw in this reasoning is that Otero County assumes, incorrectly, that New Mexico's police powers "are of the Tenth Amendment" and that they therefore constitute "applicable Federal law" within the meaning of the federal regulatory exception. [*Id.*]. The text of the Tenth Amendment confirms that state police power is not, as the county maintains, derived from the Tenth Amendment. The Tenth Amendment simply confirms that all *pre-existing* powers of the states (which necessarily includes their inherent police power) "not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. State police power is that which, as the Supreme Court has explained, was "originally and always belonging to the states," which was "not surrendered to them by the general government," and which was not "directly restrained by the constitution." *Wilkerson v. Rahrer*, 140 U.S. 545, 554 (1891) (defining a state's police power as "[t]he power of the state to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity," and describing the power as one "originally and always belonging to the states, not surrendered to them by the general government, nor directly restrained by the constitution of the United States, and essentially exclusive"). The police power, therefore, is not a constitutionally-based power but rather is an "essentially exclusive," *id.*, power arising under state law that is an incident of state sovereignty. *See Wyoming v. U.S.*, 279 F.3d at 1226 (indicating that "[h]istorically, States have possessed 'broad

44

trustee and police powers over the . . . wildlife within their borders, including . . . wildlife found on Federal lands within a State,'" and explaining that "those powers are not constitutionally-based") (citations omitted).

Moreover, even if the federal regulatory exception for actions authorized by "Federal law" could be construed to include all pre-existing state powers reserved to the states under the Tenth Amendment, Otero County's argument fails because the Court previously held that Otero County does not possess a Tenth Amendment constitutionally-based right to regulate NFS lands within its borders.   This holding necessarily requires the Court to reject Otero County's argument that the New Mexico statute and Otero County Resolution regulating NFS lands is a police power "of the Tenth Amendment" and therefore falls within the federal regulatory exception for actions authorized by federal law.[14]

Equally unconvincing is Otero County's argument that the New Mexico statute and County Resolution do not violate federal law because they were enacted for a different purpose than the purpose of the federal laws.   Otero County emphasizes that the federal regulations are aimed at "land management" while the state and county laws regulate for the welfare of New Mexico's citizens.   [Doc. 64 at 12 (maintaining that "[i]n the instant case, the [Forest Service] filed the cause of action upon the premise that state law concerning abating a nuisance/disaster . . . w[as] preempted by land management regulation and law," but that "[t]his is not an accurate statement," because the "anticipated allegedly [violative] action by Otero County is not one of land management but of ensuring the health[,] safety and welfare of its citizens")].   The Court is not

---

[14]   Otero County's argument also fails because several of the regulations do not include an exception for actions "authorized by Federal law."   *See* 36 C.F.R. §§ 261.9(a), (b); *id.* § 261.10(a), (k).   The "Federal law" exception, therefore, cannot insulate Otero County from the United States' claim that its Resolution authorizes actions that violate these regulations.

persuaded.   The distinction Otero County highlights is not supported by the substance of the laws themselves.   Otero County concedes that the state laws in part involve "land management."   [*Id.* at 12-13 (conceding that "[t]o be sure" "the allegedly [violative] action by Otero County" "involves taking action upon lands owned by the United States that involve aspects of land management")].   Likewise, the USDA's regulations do not only address "land management" but also include prohibitions and regulations enacted for the purpose of protecting the welfare of the United States' citizens pursuant to the United States' police-like powers over federal lands.[15]

Further, Otero County cites no authority supporting its contention that state laws authorizing conduct that violates federal laws are not subject to preemption if the state laws were enacted for a general purpose distinct from that of the federal law.   The Supreme Court specifically has held that, if state law conflicts with federal law, state law must recede, and that the purpose of the laws, whether parallel or divergent, is not relevant to the preemption inquiry.   *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963) (rejecting the contention that "coexistence of federal and state regulatory legislation should depend upon whether the

---

[15]   For example, the regulations prohibit "[d]ischarging a firearm or any other implement capable of taking human life, causing injury, or damaging property as follows:   (1) In or within 150 yards of a residence, building, campsite, developed recreation site or occupied area, or (2) Across or on a National Forest System road or a body of water adjacent thereto, or in any manner or place whereby any person or property is exposed to injury or damage as a result in such discharge."   36 C.F.R. § 261.10(d).   This regulation, on its face, is aimed at the protection of the health, safety, and welfare of the United States' citizens.   Likewise, the regulations prohibit "[p]lacing a vehicle or other object in such a manner that it is an impediment or hazard to the safety or convenience of any person," *id.* § 261.10(f), which also, on its face, seeks to protect the safety of the federal government's citizens.   *See also id.* § 261.10(h) (prohibiting "misrepresenting the purposes or affiliations of those selling or distributing the material; or misrepresenting the availability of the material without cost"); *id.* § 261.10(i) (prohibiting "[o]perating or using in or near a campsite, developed recreation site, or over an adjacent body of water without a permit, any device which produces noise, such as a radio, television, musical instrument, motor or engine in such a manner and at such a time so as to unreasonably disturb any person"); *id.* § 261.10(o) (prohibiting "[d]ischarging or igniting a firecracker, rocket or other firework, or explosive into or within any cave").

purposes of the two laws are parallel or divergent," explaining that the Supreme Court "has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations" and "has, on the other hand, struck down state statutes where the respective purposes were quite dissimilar," and holding that "[t]he test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives") (citations omitted).

Having concluded that the New Mexico statute and Otero County Resolution authorize actions that, if undertaken by the county, violate multiple federal regulations, the Court next determines whether these violations render the state statute and county Resolution in conflict with federal law, such that the state laws must recede.   The Court concludes that, for the reasons stated below, Otero County's proposed actions of cutting and removing trees from NFS lands without Forest Service authorization are in direct conflict with federal regulations prohibiting these unauthorized actions on NFS lands.

State laws are in direct conflict with federal law either when compliance with both federal and state laws is a "physical impossibility," *Arizona v. U.S.*, 132 S. Ct. 2492, 2501 (2012) (quoting *Florida Lime & Avocado Growers*, 373 U.S. at 142-43), or when "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).   Because the New Mexico statute and Otero County Resolution simply authorize or "empower[]" a New Mexico county to cut or remove trees from NFS lands, but do not compel a county to take these actions, compliance with both state and federal laws is not per se physically impossible.   *See Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996) (explaining that the federal and state statutes are not in "'irreconcilable

47

conflict,'" where the state law prohibited selling insurance and the federal law permitted but did not require selling insurance, because the "two statutes do not impose directly conflicting duties on national banks—as they would, for example, if the federal law said, 'you must sell insurance,' while the state law said, 'you may not'").   The Court concludes, however, that the statute and Resolution nonetheless conflict with federal law because they stand as an obstacle to the accomplishment and execution of Congress's full purposes and objectives.   *See id.* (holding that although the state and federal laws were not in "'irreconcilable conflict'" the state's prohibition on activities authorized by federal statute "would seem to 'stan[d] as an obstacle to the accomplishment' of one of the Federal Statute's purposes").

If Otero County satisfies the prescribed state and local precondition of simply "consulting" with the federal forester prior to taking any action on NFS lands, then the statute and Resolution authorize and empower Otero County to clear, thin, remove, or log trees on NFS lands without requiring the county first to comply with the aforementioned federal regulations by ensuring that its actions fall are authorized by a special use authorization, permit, timer sales contract, federal law or regulation, and/or federal consent.   *See id.* §§ 261.6(a),(h), 261.10(c),(k), 251.50(a).   The "consult[ation]" with the United States forester that the New Mexico statute and Otero County Resolution contemplate is not sufficient to bring the county's actions within the federal regulatory exception and thereby render the state and local laws consistent with federal law, for consultation falls far short of ensuring that the county's actions are authorized by a special use authorization, permit, timber sale contract, federal law or regulation, or consent.[16]

---

[16]   The Merriam-Webster dictionary definition of "consult" is "to talk about something with (someone)   in   order   to   make   a   decision."   *Merriam-Webster Dictionary Online*, http://www.merriam-webster.com/dictionary/consult (Aug. 10, 2015).   Under the plain meaning of "consult," it is clear that the state and local laws require the county only to discuss the actions it

The Court concludes that a state or county's authorization of actions that violate federal regulations necessarily impedes the accomplishment and execution of the full purposes and objectives of Congress.   Congress specifically provided that "[t]he Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests" and that the Secretary "may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction."   16 U.S.C. § 551. Moreover, Congress clearly intended the Secretary's regulations to have the force of law, for it expressly provided that "any violation of [the Secretary's] rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both."   *Id.* Because the New Mexico statute and Otero County Resolution authorize and thus invite actions that directly violate multiple federal regulations promulgated pursuant to congressional mandate, the state statute and county Resolution are in direct conflict with federal law.   *Cf. Sch. Bd. Of Avoyelles Parish v. U.S. Dep't of Interior*, 647 F.3d 570, 582 (5th Cir. 2011) (holding that to the extent that Louisiana law granting a property owner of enclosed land an easement over a subservient estate to access the enclosed land "permit[ted] the School Board to enter, use, or otherwise occupy [federally-owned] Refuge lands in violation of FWS [United States Fish and Wildlife Service] regulations, Louisiana law is in direct conflict with federal law and is

---

intends to take on NFS lands with the Forest Service and not to obtain permission from the Forest Service prior to acting.   *See Diamond v. Diamond*, 283 P.3d 260, 265 (N.M. 2012) (explaining that a court must give effect to the clear and unambiguous meaning of a statute and decline from further statutory interpretation when the meaning of a statute is clear and unambiguous) (citation omitted); *see also infra* § V (rejecting the State of New Mexico's argument that "consult" can be construed to require consent).

pre-empted").[17]

      2.    <u>The New Mexico Statute and Otero County Resolution Also Conflict with Congress's Statutory Scheme Governing NFS Planning and Land Management</u>.

      The New Mexico statute and Otero County Resolution conflict with federal law not only because they authorize actions that violate multiple federal regulations, but also because they impede the purposes and objectives of Congress's comprehensive statutory scheme governing NFS planning and land management.   Congress has established a limited, multiple-use mandate for NFS lands, prescribing that the national forests shall be used for the purposes of recreation, timber, fish and wildlife, and watershed and water flow management.   *See* 16 U.S.C. § 528; *id.* § 475.   Specifically, in the Organic Administration Act of 1897, Congress originally established a more limited multiple-use mandate, *see Wyoming v. U.S. Dep't of Agriculture*, 661 F.3d 1209,

---

[17]   Although the Fifth Circuit's decision in *School Board of Avoyelles Parish v. United States Department of Interior* is not controlling, the facts of that case are analogous and provide persuasive support for the Court's decision.   In *Avoyelles Parish*, the plaintiff school board argued that it needed only to comply with state law to obtain its easement across a federally-owned refuge operated by the Fish and Wildlife Service ("FWS"), which is an agency within the Department of Interior, and that it was not required to comply with additional restrictions on the easement that the FWS sought to impose.   *See id.* at 575, 580.   The defendant United States Department of Interior did not dispute the school board's entitlement to a right of way, but argued that the National Wildlife Refuge System Administration Act of 1966 and regulations promulgated thereto granted the FWS the authority to impose conditions on the school district's right of way.   *See id.* at 576.   The Fifth Circuit held that Louisiana state law "direct[ly] conflicted" with federal laws authorizing FWS to impose conditions upon the school board's right of way, because the state law granted the school board a right of way without requiring the board to comply with the FWS's conditions.   *Id.* at 582.   While the court acknowledged that "[t]he law of property is one of those 'areas of law traditionally reserved to the states,' where a strong presumption against pre-emption applies," *id.* (quoting *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010)), the court explained that, "[e]ven that presumption . . . cannot overcome a direct conflict with federal law."   *Id.*   The Fifth Circuit's reasoning applies equally here.   While Otero County contends that it need not comply with the conditions imposed by the Forest Service upon its use of NFS lands, the New Mexico statute and county Resolution, which permit this non-compliance, are in direct conflict with the federal laws authorizing the Forest Service to place conditions upon the use of NFS lands.

1221 (10th Cir. 2011) ("*Wyoming II*") (explaining that the Organic Administration Act established "a limited multiple-use mandate for management of the National Forests"), authorizing use of the forests for the purposes of "'improv[ing] and protect[ing] the forest[s],'" "'securing favorable conditions of water flows,'" and "'furnish[ing] a continuous supply of timber for the use and necessities of citizens of the United States,'" *id.* (quoting 16 U.S.C. § 475), and, in the Multiple-Use Sustained-Yield Act of 1960 ("MUSYA"), Congress expanded that limited multiple-use mandate to include use of the national forests for the additional purposes of outdoor recreation, range, timber, watershed, and wildlife and fish purposes, *see* 16 U.S.C. § 528 ("It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," and that "[t]he purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title [*i.e.*, the Organic Administration Act]").

Congress has delegated the authority to the USDA, and in turn, the Forest Service,[18] to manage NFS lands consistent with Congress's multiple-use mandate.   For example, the Organic Administration Act "empowers the Secretary of [the USDA], through the Forest Service, to 'make

---

[18]   Congress originally delegated in the Organic Administration Act responsibility for managing NFS lands to the Secretary of the Interior, *see* 30 Stat. 35; *U.S. v. Dastervignes*, 118 F. 199 (9th Cir. 1902), but, in 1905, Congress transferred responsibility for managing NFS lands to the Secretary of Agriculture, *see* 16 U.S.C. §§ 472, 551.   The authority delegated to the USDA in turn was delegated to the Under Secretary for Natural Resources and Environment and then to the Chief of the Forest Service.   *See* 7 U.S.C. § 6961(c); 7 C.F.R. § 2.60(a).   Thus, it can be said that the Forest Service, an agency within the USDA, is charged with administering the national forests, for the "Organic Act of 1897 empowers the Secretary of Agriculture, through the Forest Service," to enact regulations, *Wyoming II*, 661 F.3d at 1234 (quoting 16 U.S.C. § 551).   Consistent with this power, the "Forest Service began actively managing the NFS—under the authority of the Organic Act—in 1905, after the department was transferred to the Department of Agriculture," *id.* at 1221 n.5 (citation omitted).

provisions for the protection against destruction by fire and depredations upon the public forests and national forests' and 'make such rules and regulations . . . to regulate [the national forests'] occupancy and use and to preserve the forests thereon from destruction.'" *Wyoming II*, 661 F.3d at 1234 (quoting 16 U.S.C. § 551). The MUSYA, likewise, authorizes and directs the USDA and, in turn the Forest Service, to manage the national forests in a manner that preserves Congress's expanded multiple-use mandate, that gives "due consideration" to the "relative values of the various resources in particular areas," and that will best meet the needs of the American people pursuant to the principles of multiple use and sustained yield. 16 U.S.C. § 529; *see also Wyoming II*, 661 F.3d at 1235 (confirming that Congress "reaffirmed the Forest Service's authority to manage national forests for a wide range of uses").[19] And, the National Forest Management Act, which Congress enacted in 1976, instructs the Forest Service to manage each forest unit at two different levels pursuant to multiple-use and sustained yield principles. *See Wyoming II*, 661 F.3d at 1222 (citing 16 U.S.C. § 1604); *Colo. Environmental Coal. v. Dombeck*, 185 F.3d 1162,

---

[19]   The MUSYA defines "[m]ultiple use" as

> [t]he management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a). The act defines "[s]ustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." *Id.* § 531(b).

1167-68 (10th Cir. 1999).   Specifically, Congress instructed the Forest Service, "[a]t the programmatic level, [to] create[] general, forest-wide planning goals memorialized in a forest plan [("Forest Plan")]," with "each forest plan envision[ing] the forest will be used for multiple purposes," *Utah Environmental Congress v. Bosworth*, 443 F.3d 732, 737 (10th Cir. 2006) (quoting 16 U.S.C. § 1604(e)(1)), and with each Forest Plan complying with NEPA, MUSYA, and other applicable environmental statutes, *see* 16 U.S.C. §§ 1604(e), (g)(1).   Congress further commanded the Forest Service "[a]t the project or site-specific level, [to] implement[] the forest plan by approving or disapproving particular projects using an environmental impact statement, an environmental assessment, or a categorical exclusion," *Bosworth*, 443 F.3d at 737, and to ensure that each project complies with the applicable Forest Plan, *see id.* (citations omitted); 16 U.S.C. §1604(i).

These statutes demonstrate Congress's intent to delegate to the Forest Service—not state or local governments—the task of managing the national forests pursuant to Congress's multiple-use mandate and that Congress intended the Forest Service's authority to be "broad," *Wyoming II*, 661 F.3d at 1235 (explaining that the Organic Administration Act's and MUSYA's provisions demonstrate that Congress delegated to the Forest Service "broad" discretion to regulate NFS lands) (citing *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) ("The language found in [the MUSYA] . . . breathe(s) discretion at every pore.")).   The Organic Administration Act "reveals a clear intent of Congress to commit regulation of the national forests" for fire prevention, occupancy and use, and conservation purposes in a manner consistent with the multiple-use mandate "to the discretion of the Secretary [of the USDA]" and the Forest Service.   *Mountain States Tel. & Tel. Co. v. U.S.*, 499 F.2d 611, 614 (Ct. Cl. 1974), *cited in Wyoming II*, 661 F.3d at 1234.   Similarly, by enacting the MUSYA, Congress demonstrated its clear intent to delegate

broad discretion to the Forest Service, and not to state or local governments, to balance the many uses of the national forests in a manner that the Forest Service determines best serves the American people and satisfies Congress's multiple-use and sustained yield prescriptions. *See* 16 U.S.C. §§ 529, 531. Likewise, by enacting the NFMA, Congress clearly established how it wanted the national forests managed and by whom: Congress's purpose was to delegate to the Forest Service—not to state or local governments—the dual responsibilities of creating Forest Plans that facilitate the management of the national forests in a manner consistent with Congress's multiple-use mandate and federal law, and of ensuring that all third-party uses of the forests are consistent with the Forest Plans created by the Forest Service and with the multiple-use mandate and federal laws devised by Congress. *See Bosworth*, 443 F.3d at 737; 16 U.S.C. §1604(i); *id.* §§ 1604(e), (g)(1). While, the regulatory scheme Congress enacted provides for the Forest Service to cooperate with state and local governments in making land management decisions, *see, e.g.*, *id.* § 1604(a) (requiring the Forest Service to develop its Forest Plans in coordination "with the land and resource management planning processes of State and local governments"); 40 C.F.R. § 1506.2(b) (providing that "[a]gencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements"); *accord id.* §1506.2(c) (same), in the end, the statutory framework makes clear that Congress contemplated that all final decision-making authority rest with the Forest Service and not in a state or local governmental body.

The New Mexico statute and Otero County Resolution would reverse the roles of the Forest Service and local government and thus frustrate the very purpose of the statutory regime enacted by Congress. Subsection A of the state act provides that the federal government has "forfeit[ed]" its "jurisdictional supremacy" thereby creating a "jurisdictional vacuum" requiring

New Mexico to "assum[e] jurisdiction to reduce to acceptable levels, if not remove, the threat of catastrophic fires posed by present conditions in national forests," N.M. Stat. Ann. § 4-36-11(A)(3), (4), and Subsection C authorizes a county, after "consulting with . . . the regional United States forester," to "take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damages trees within the area of the disaster," *id.* § 4-36-11(C).   The Otero County Resolution, which the county passed pursuant to the New Mexico act, "empower[s]" the county "to, after consulting with . . . the Regional United States Forester, . . . to take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster."   [Doc. 1-2 at 2].   These laws reverse the hierarchy contemplated by Congress and confirmed in numerous federal statutes.   Under the state regime, the Forest Service is relegated to only the cooperative role of consultant and is left with no final decision-making authority.   Instead, under the state laws it is Otero County that is empowered to decide what actions on NFS lands are necessary and what actions will be taken.   For the reasons discussed below, it is "painfully apparent," *Wyoming v. U.S.*, 279 F.3d at 1227, that this reversal in hierarchy, with all of its resulting implications, "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Arizona,* 132 S. Ct. at 2501 (quoting *Hines*, 312 U.S. at 67 ).

Congress's two primary purposes for enacting its statutory regime governing forest planning and land management were to preserve and facilitate its multiple-use mandate and to delegate broad discretion to oversee this task to the Forest Service.   Congress long ago established its multiple-use mandate in 1897, when it passed the Organic Administration Act.   *See* 16 U.S.C. § 475.   Over sixty years later, in 1960, Congress reiterated this mandate when it enacted the MUSYA, *see Wyoming II*, 661 F.3d at 1221, and then again, sixteen years later in 1976, Congress

carried forward its multiple-use mandate when it passed the NFMA, *see id.* at 1221-22. In addition, in the NFMA, Congress clearly charged the Forest Service—not state and local governments—with the task of managing NFS lands in a manner that the Forest Service determines best balances the many uses of the forests mandated by Congress and the many surface resources of the national forests so that they are utilized in a harmonious combination that best meets the needs of American citizens and serves Congress's multiple-use principles. *See* 16 U.S.C. §§ 529, 531. Congress further granted "broad" authority, *see Wyoming II*, 661 F.3d at 1235, that "breathe(s) discretion at every pore," *Perkins*, 608 F.2d at 806, *cited in Wyoming II*, 661 F.3d at 1235, to the Forest Service to accomplish these mandates.

The Otero County Resolution frustrates Congress's purposes underlying its statutory scheme. Under the state laws, Otero County undertakes the role of final decision-maker, and it is Otero County that will decide what actions are necessary and will be taken on NFS lands. This reversal directly contravenes the congressional purpose of placing the Forest Service in charge of determining how the national forests will be used. Moreover, the reversal impedes the congressional purpose of preserving and enforcing Congress's multiple-use mandate for the national forests because, unlike the Forest Service, Otero County is under no prescription to manage the national forests in a manner consistent with their many uses or to ensure that the many surface resources of the national forests are utilized in a harmonious combination. To the contrary, the New Mexico statute and Otero County Resolution expressly are aimed at the single purpose of "reduc[ing] to acceptable levels, if not remov[ing], the threat of catastrophic fires posed by present conditions in national forests," N.M. Stat. Ann. § 4-36-11(A)(4), without any regard for the environmental impact of this singular focus on the many uses of the forests or Congress's multiple-use mandate.

The state regime's singular focus on fire prevention is an approach that Congress specifically rejected when it enacted the Healthy Forests Restoration Act of 2003 ("HFRA"), in which Congress specifically charged the Forest Service with reducing the risk of wildfire on NFS lands by planning and implementing fuel reduction projects.  *See* 16 U.S.C. § 6501 *et seq.* Although Congress delegated the task of reducing the risk of wildfire on NFS lands to the Forest Service, it nonetheless required the Forest Service to ensure that all hazardous fuel reduction projects are consistent with applicable Forest Plans, *see id.* § 6512(b), and federal land management and environmental laws, *see id.* § 6514(a)(1), (2).  By requiring preventative fuel reduction projects to be consistent with federal plans and law, Congress implicitly rejected the state and county's singular focus on fire prevention.  Forest Plans and federal laws are premised not upon the singular focus of fire prevention but rather upon the multi-faceted focus of preserving, protecting, and balancing the many uses of the national forests.  Thus, by subjecting the Forest Service's fuel reduction projects to compliance with federal plans and laws, Congress confirmed that a primary purpose of its statutory framework was to ensure that the national forests are managed in a manner that preserves the forests for their many uses.

The state regime also frustrates an additional congressional purpose, established in the NFMA, of ensuring that all uses of NFS lands are evaluated pursuant to a multi-stage review and that all uses are consistent with the applicable Forest Plan and federal law.  Under the NFMA, the Forest Service at the programmatic level must create Forest Plans that account for the different interests arising out of the forests' multiple uses and that comply with federal environmental laws, *see Bosworth,* 443 F.3d at 737; 16 U.S.C. §§ 1604(e), (g)(1), and at the project level must implement Forest Plans by approving or disapproving particular projects and by ensuring that all projects comply with the applicable Forest Plan, *see Bosworth*, 443 F.3d at 737; 16 U.S.C. §

1604(i).  Because the state regime takes decision-making authority from the Forest Service and places this power in the hands of the counties, the regime prevents the Forest Service from engaging in the two levels of management that Congress prescribed.

   3.   The New Mexico Statute and Otero County Resolution Violate the Supremacy Clause and Therefore are Preempted by Federal Law.

   Having concluded that the New Mexico statute and Otero County Resolution conflict with federal law, both because they are in direct conflict with federal regulations and because they frustrate the objectives of Congress's comprehensive legislative scheme governing national forest planning and management, the Court holds that the Supremacy Clause of the Constitution requires the Court to declare the New Mexico statute and Otero County Resolution invalid.  It is well settled that, when state law conflicts with federal law, federal law preempts state law.  *See Arizona*, 132 S. Ct. at 2500-4 (explaining that "[f]rom the existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes," that "[t]he Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land,'" and that under this principle "Congress has the power to preempt state law") (quoting U.S. Const. art VI, cl.2) (additional citation omitted).  Here, the New Mexico statute and Otero County Resolution are preempted because they directly conflict with federal law.  Accordingly, the Court grants the United States' Motion for Summary Judgment to the extent it seeks a declaration that Otero County Resolution Number 05-23-11/99-50 is in conflict with federal law, that the Resolution violates the Supremacy Clause of the United States Constitution, and that the Resolution therefore is invalid.  The Court further denies Otero County's Motion for Summary Judgment because the relief Otero County seeks is contrary to this Court's resolution of the legal dispute at issue

therein.[20]

V.    The Court Grants the United States Summary Judgment on its Claims against the State of New Mexico.

The United States seeks summary judgment on its claim against the State of New Mexico, in which it asks the Court to declare that Section 4-36-11 of New Mexico Statutes Annotated is in conflict with federal law, that the state law violates the Supremacy Clause of the United States Constitution, and that it therefore is unconstitutional and must be invalidated.  [Doc. 1 ¶ 55].   In opposition to this motion, the State of New Mexico does not argue, as did Otero County, that it has a Tenth Amendment right to regulate federal lands or that the United States has exceeded its Property Clause powers by enforcing federal laws against the state.   [Doc. 78 at 9 (conceding that "[t]he United States has the plenary right to enact laws governing the national forest land it owns under the Property Clause and the Supremacy Clause")].   Rather, New Mexico contends that a more "preferable" interpretation of the New Mexico statute exists and that this interpretation renders the statute in harmony with federal law and therefore valid under the Supremacy Clause. Thus, the sole dispute between New Mexico and the United States is one of statutory construction.

New Mexico argues that Section 4-36-11 is constitutional because the consultation requirement set forth in Subsection (C) can be "interpreted as binding, so that any action by a county can only take place *after* the approval of the United States," and that, when so construed,

---

[20]    The United States advances the additional arguments that the New Mexico statute is unconstitutional on its face because it provides that the United States has "forfeit[ed]" its "jurisdictional  supremacy" over national Forest System lands, and that the statute therefore is invalid, because it violates the Property and Supremacy Clauses of the United States Constitution, [Doc. 71 at 22], and (2) that the New Mexico statute and Otero County Resolution are preempted by federal law because "Congress has demonstrated its intent to occupy the field of [NFS] planning and management such that any state law purporting to do the same is preempted," [*id.* at 36].   The Court declines to consider these arguments because the Court invalidates the New Mexico statute and Otero County Resolution on the dispositive ground that they directly conflict with federal law.

the statute does not conflict with federal law.   [*Id.* at 2].   In support of this argument, the state

first contends that its construction of "consult[]" is supported by the dictionary definition, which

defines "consult" as "'to talk about something with (someone) in order to make a decision.'"   [*Id.*

at 9 (quoting *Merriam-Webster Dictionary Online*,

http://www.merriam-webster.com/dictionary/consult (Aug. 15, 2014)].   The Court earlier

rejected this argument in the context of ruling upon the cross-motions for summary judgment

between the United States and Otero County.   As the Court explained, the definition of "consult"

is "to talk about something . . . in order to make a decision."   This definition only implies that,

prior to reaching a decision, two or more parties discuss "something," presumably relevant to the

decision, for the purpose of making the decision.

 The Court refuses to adopt New Mexico's strained interpretation of "consult" that requires

anything more than its ordinary definition.   The definition of "consult" says nothing about the

relative weight or binding effect of any one discussing-participant's opinion on what the actual

decision itself should be.   Thus, it does not place the federal forester in a superior position to that

of the county, and it does not require the county to defer to the federal forester.   If the New

Mexico legislature had intended to make the United States forester's decision arising out of the

consultation final and binding, as New Mexico asserts, the legislature would not have selected for

the language in its statute a neutral word such as "consult," which says nothing of the relative

decision-making power of the participants to the discussion.   Instead, the legislature would likely

have chosen any one of the multitude of obvious linguistic choices available to it that would have

conveyed—in a clear and straightforward manner—that the county must first obtain Forest

Service authorization prior to taking any action on NFS lands.

 New Mexico's interpretation is contrary to the plain meaning of the statute.   When a

statute is clear and unambiguous, pursuant to the rules of statutory construction, the Court must give effect to that language without further interpretation.   *See, e.g.*, *Diamond v. Diamond*, 283 P.3d 260, 265 (N.M. 2012) (It is well settled that "[w]here the language of a statute is clear and unambiguous, [a court] must give effect to that language and refrain from further statutory interpretation.") (citation omitted).   The New Mexico statute's pre-condition of consultation with the United States forester means precisely what the definition of "consult" conveys.   A county is required to "talk" with the Forest Service but not to obtain the Forests Service's consent.

The Court also rejects New Mexico's "preferable" interpretation of the New Mexico statute because it is not consistent with the statute's legislative intent.   It is well established that in "interpreting a statute, [a c]ourt's primary goal is to ascertain and give effect to the intent of the legislature."   *Id*.   New Mexico's interpretation is in contravention of that intent, which the legislature clearly expresses in Subsection A of the statute.   On this point, the United States persuasively argues that,

> when taken in context of the entire statute, the consultation provision is plainly meant to consign the Forest Service to an informational "consultant" role only, vesting the decision-making and implementation authority in the county.  Pursuant to Section 4-36-11(A), the State finds that perceived inaction on the part of the Forest Service in addressing alleged hazardous fire conditions on National Forest System lands has resulted in a "risk to the lives and property of the citizens of New Mexico," such that the Forest Service has *forfeited* its "jurisdictional supremacy."   It further requires the State to fill that "jurisdictional vacuum" so that the State—not the Forest Service—can "authorize any action [the State] presently deems necessary to . . . reduce to acceptable levels, if not remove, the threat of catastrophic fires." . . . Section 4-36-11(B) and Section 4-36-11(C), in turn, provide the mechanism for delegating the Forest Service's forfeited authority from the State to its counties. If the Forest Service's jurisdiction to take action has already been forfeited to the State, as the New Mexico Statute finds, then it would be inconsistent to read the consultation provision to require a county to submit to the Forest Service's jurisdiction, as the State now

61

asserts.

[Doc. 92 at 23-24].

Subsection A of the statute reveals that the clear and unequivocal intention of the New Mexico legislature was to place the state and county (not the federal Forest Service) in a superior position in the state-federal hierarchy and to grant the local (not federal) government the right to make the final decision to cut and remove trees on NFS lands.   *See* N.M. Stat. Ann. § 4-36-11(A). Subsection A expresses, in detail, the legislature's intent to strip the federal government of its "jurisdictional supremacy," to forfeit that supremacy to the state and counties, and to authorize the state and counties to take any actions they deem necessary to reduce if not remove the threat of catastrophic fires in the national forests.   *See id.*   New Mexico's "preferable" interpretation of "consult, which requires a county to obtain federal approval prior to taking any actions on federal land, is the opposite of what the New Mexico legislature intended.   Because legislative intent is pivotal, the Court rejects New Mexico's interpretation.

The state attempts to overcome this shortcoming by arguing the Court should sever Subsection A from the remainder of the statute.   In support of this argument, the state cites *State v. Frawley*, 172 P.3d 144, 155 (N.M. 2007), in which the Supreme Court of New Mexico held that "'where the invalid part [of a law] may be separated from the other [valid] portions, without impairing the force and effect of the remaining parts,'" a court may sever the invalid part and thereby render the remainder of the statute valid.   *Id.* (quoting *Bradbury & Stamm Constr. Co. v. Bureau of Revenue*, 372 P.2d 808, 811 (N.M. 1962) (additional citation omitted), *cited in* Doc. 78 at 10.   *Frawley* holds, however, that severance is not appropriate "when considering the entire act it cannot be said that the legislature would have passed the remaining part if it had known that the objectionable part was invalid."   172 P.3d at 155.   It is clear that, had the legislature known that

Subsection A would violate the Constitution, *i.e.*, that New Mexico could not lawfully grant counties the authority to cut and remove trees on NFS lands over Forest Service objection, and that Subsection C would be construed to authorize a county to act only after it receives the approval of the United States, the legislature would not have had any purpose for passing, and therefore would not have passed, the statute.  For, as the United States persuasively argues, "severing Section 4-36-11(A) (and rewriting Section 4-36-11(C) to require more than just consultation with the [federal] Forester) would completely change the 'force and effect' of [the remaining subsections] and would gut the purpose of the Statute of presumably expediting actions to address alleged hazardous fire conditions by removing Forest Service authorizations from the equation."  [Doc. 92 at 26].  For these reasons, the Court declines the state's invitation to sever Subsection A from the remainder of the statute.

The Court likewise is not persuaded by New Mexico's arguments that its proposed interpretation of Section 4-36-11(C) is "preferable" because it renders the statute constitutional, it comports with federal laws that encourage and require state and local participation in national forest planning, and it is consistent with the cooperative efforts that already have occurred between the parties.  [Doc. 78 at 8].  Although the Supreme Court has acknowledged that "of course, statutes should be construed whenever possible so as to uphold their constitutionality," *U.S. v. Vuitch*, 402 U.S. 62, 70 (1971); *see also In re Stewart*, 175 F.3d 796, 812 (10th Cir. 1999) (explaining that courts should "avoid resolution of the constitutionality of a statute if a *reasonable*, alternative statutory interpretation poses no constitutional question") (emphasis added and citations omitted), this rule of interpretation in no way sanctions the reading of a statute in a manner that is inconsistent with the plain meaning of its language.  Furthermore, where, as here, the "legislature clearly intended" a statute to achieve a particular result—*i.e.*, placing the County in

63

a position superior to that of the federal Forest Service—"and the constitutional issue can be easily resolved," our Tenth Circuit has held that "[it is] more prudent to resolve the constitutional issue than 'press statutory construction to the point of disingenuous evasion.'"   *In re Locke,175 F.3rd at 812* (quoting *U.S. v. Locke*, 471 U.S. 84, 96 (1985)); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (stating that "although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it") (internal quotation marks and citations omitted).   The state's proposed interpretation of the statute's consultation requirement is precisely the type of "disingenuous evasion" that the Tenth Circuit has instructed courts to reject.

The Court also is not persuaded that it should adopt the state's proposed interpretation because it is consistent with other federal statutes encouraging cooperation at federal, state, and local levels, or because it is consistent with the parties' alleged experience of "work[ing] together" as contemplated by Section 4-36-11.   [Doc. 78 at 10].   The state fails to cite, and this Court has not found, any authority supporting the proposition that statutes should be interpreted in a manner inconsistent with their plain meaning if that interpretation renders the statute consistent with other federal laws or reflects the actual experience of the parties implementing the statute.

For the reasons stated herein, the Court holds that the plain language of the New Mexico statute does not support an interpretation of the statute that is in harmony with federal law.   The Court has held that the New Mexico statute conflicts with and is preempted by federal law and that it therefore is invalid under the Supremacy Clause of the United States' Constitution.   *See supra* § IV.B.3.   Having rejected the State of New Mexico's sole argument in opposition to the United States' Motion for Summary Judgment, and having held that statute is preempted by federal law,

the Court grants the United States' Motion for Summary Judgment to the extent it seeks a declaration that Section 4-36-11 of New Mexico Statutes Annotated is in conflict with federal law, that the statute violates the Supremacy Clause of the United States Constitution, and that the statute therefore is invalid.

## **CONCLUSION**

The Court denies PLF's Motion for Leave to File Brief Amicus Curiae.   The United States has standing to assert its claims, its claims are ripe, and this Court therefore has subject matter jurisdiction over the claims.   In addition, on the merits of the motions for summary judgment, the Court concludes that, for the reasons articulated herein, the Property Clause of the United States Constitution grants Congress plenary power (and the Tenth Amendment therefore does not reserve for New Mexico any sovereign police power) over federal lands, that the New Mexico statute and Otero County Resolution conflict with federal law, that the statutory language of the New Mexico statute and its legislative intent prevent the Court from interpreting the statute in a manner consistent with federal law, and that the statute and Resolution therefore violate the Supremacy Clause of the United States Constitution, are preempted by federal law, and are invalid.

**IT THEREFORE IS ORDERED** that Pacific Legal Foundation's Motion for Leave to File Brief Amicus Curiae [Doc. 83] is **DENIED**, and that Otero County's Motion for Summary Judgment [Doc. 63] is **DENIED**.

**IT FURTHER IS ORDERED** that The United States' Motion for Summary Judgment [Doc. 70] is **GRANTED** as follows:

(1)     The Court declares that Otero County Resolution Number 05-23-11/99-50 is in conflict with federal law, that the Resolution violates the Supremacy Clause of the

United States Constitution, and that the Resolution therefore is unconstitutional and invalid.

(2)     The Court declares that that Section 4-36-11 of New Mexico Statutes Annotated is in conflict with federal law, that the statute violates the Supremacy Clause of the United States Constitution, and that the statute therefore is unconstitutional and invalid.

**SO ORDERED** this 30th day of September, 2015.

_____
M. CHRISTINA ARMIJO
CHIEF UNITED STATES DISTRICT JUDGE

66